**William SHOEMAKER, Angel Cordero, Jr., William Herbert McCauley, Philip Grove and Vincent Bracciole, Plaintiffs,**

**v.**

**Hal HANDEL, Executive Director of the New Jersey Racing Commission, Samuel A. Boulmetis, Steward Representing NJ Racing Commission, Joseph F. Piarulli, Associate Steward, Carl H. Hanford, Associate Steward and Richard W. Lawrenson, Associate Steward, Defendants.**

Civ. A. No. 85–1770.

United States District Court,
D. New Jersey.

May 13, 1985.

---

William L. Bowe, Bowe & Rakinic, Woodbury, N.J., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Steven Wallach, Deputy Atty. Gen., Div. of Law, Richard J. Hughes, Justice Complex, Trenton, N.J., for defendants.

BROTMAN, District Judge.

Plaintiffs, William Shoemaker, Angel Cordero, Jr., William Herbert McCauley, Philip Grove, and Vincent Bracciole bring this action under 42 U.S.C. § 1983, seeking a preliminary injunction against defendants Hal Handel, Samuel A. Boulmetis, Joseph A. Piarulli, Carl H. Hanford, and Richard W. Lawrenson, to restrain the enforcement of New Jersey Racing Commission Regulations N.J.A.C. 13:70–14A.10 and 13:70–14A.11, which provide for breathalyzer and urine tests for licensed jockeys.

This matter having come before the court on April 24, 1985, and the court, having considered the submissions and arguments of the parties, makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Plaintiffs William Shoemaker, Angel Cordero, Jr., William Herbert McCauley, Philip Grove, and Vincent Bracciole are licensed jockeys of the State of New Jersey who have ridden and intend to continue to ride in thoroughbred horse races in the State of New Jersey.

2. Defendant Hal Handel is the Executive Director of the New Jersey Racing Commission ("Racing Commission"), Trenton, New Jersey.

3. Defendant Samuel A. Boulmetis is the Steward representing the Racing Commission at the race meeting held at the Garden State Park, Cherry Hill, New Jersey.

4. Defendants Joseph A. Piarulli, Carl H. Hanford, and Richard W. Lawrenson are Associate Stewards representing the Racing Commission at the race meeting held at the Garden State Park, Cherry Hill, New Jersey.

5. The New Jersey State Legislature has established a New Jersey Racing Commission, vested with the broad "powers necessary or proper to enable it to carry out fully and effectually all the provisions and purposes of this act," including jurisdiction over "any and all persons, partnerships, associations or corporations which shall hereafter hold or conduct any meeting within the State of New Jersey whereat horse racing shall be permitted for any stake, purse, or reward." N.J.S.A. 5:5–22.

6. The Racing Commission promulgated N.J.A.C. 13:70–14A.10 and 14A.11 (attached hereto as Appendix A), pursuant to its authority granted by N.J.S.A. 5:5–30. These regulations permit the use of breathalyzer and urine tests to detect the presence of alcohol or controlled dangerous substances as defined in N.J.S.A. 24:21–1 *et seq.* They were proposed on June 18, 1984, 16 N.J.R. 1457(a), adopted on January 14, 1985, 17 N.J.R. 470, effective on February 19, 1985, and operational on April 1, 1985.

7. N.J.A.C. 13:70–14A.10 provides that a State Steward may direct officials, jockeys, trainers and grooms to submit to a breathalyzer test. If the result of that test shows a reading of .05 percent of alcohol in the blood, "such person shall not be permitted to continue his duties." The Steward "may fine or suspend any participant who records a blood alcohol reading of .05 per-

cent or more." Second or repeat offenders "shall be subject to expulsion, or such penalty as the stewards may deem appropriate."

8. N.J.A.C. 13:70–14A.11 provides, *inter alia*, that "'[e]very jockey for any race at any licensed racetrack may be subjected to a post-race urine test, or other non-invasive fluid test at the direction of the State Steward in a manner prescribed by the New Jersey Racing Commission. Any jockey who fails to submit to a urine test when requested to do so by the State Steward shall be liable to the penalties provided in N.J.A.C. 13:70–31." N.J.A.C. 13:70–14A.11(b). The regulation further provides that a "positive" drug test result be reported in writing to the Executive Director of the Racing Commission or his designee. N.J.A.C. 13:70–14A.11(d).

9. N.J.A.C. 13:70–14A.11 also provides that "'[t]he results of any urine test shall be treated as confidential, except for their use with respect to a ruling issued pursuant to this rule, or any administrative or judicial hearing with regard to such a ruling. Access to the reports of any 'positive' results shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee and the subject jockey, except in the instance of a contested matter." N.J.A.C. 13:70–14A.11(e).

10. N.J.A.C. 13:70–14A.11 also provides that "'[n]o jockey shall use any Controlled Dangerous Substance as defined in the 'New Jersey Controlled Dangerous Substance Act,' N.J.S.A. 24:21–1, *et seq.* or any prescription legend drug, unless such substance was obtained directly, or pursuant to a valid prescription or order from a licensed physician, while acting in the course of his professional practice. It shall be the responsibility of the jockey to give prior notice to the State Steward that he is using a Controlled Dangerous Substance or prescription legend drug pursuant to a valid prescription or order from a licensed practitioner." N.J.A.C. 13:70–14A.11(a).

11. On April 1, 1985, a meeting was held in the jockey's room at the Garden State Park, Cherry Hill, New Jersey, among representatives of the Racing Commission, jockeys, and representatives of the National Jockeys Guild, the purpose of which was to explain the new regulations.

12. The Jockeys Guild requested that the Racing Commission defer implementation of these regulations until a court challenge to their validity could be mustered. The Racing Commission declined to defer enforcement.

13. Defendants have forced or threatened to force plaintiffs to undergo breathalyzer and/or urine testing pursuant to N.J.A.C. 13:70–14A.10 and 14A.11.

14. Defendants have forced or threatened to force plaintiffs to fill out certain forms requiring the disclosure of personal medical data and other information pursuant to N.J.A.C. 13:70–14A.11(a).

## II. CONCLUSIONS OF LAW

1. The following Conclusions of Law, insofar as they may be considered Findings of Fact, are so found by this court to be true in all respects.

2. Jurisdiction is conferred upon this court by 28 U.S.C. §§ 1331 and 1343, this being a suit under 42 U.S.C. § 1983, which provides, in pertinent part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. In order to support the entry of a preliminary injunction under Federal Rule of Civil Procedure 65(b), the applicant must make a showing as to the following four factors:

(a) the significance of the threat of irreparable harm to plaintiffs if the injunction is not granted;

(b) the state of the balance between this harm and the injury that granting the

injunction would inflict upon the defendant;

(c) the probability that plaintiff will prevail on the merits; and

(d) the public interest will be served.

The court must balance these factors. *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3rd Cir.1982); ·*Continental Group, Inc. v. Amoco Insurance Company,* 614 F.2d 351 (3rd Cir. 1980); *Rennie v. Klein,* 462 F.Supp. 1131, 1142 (D.N.J.1978).

■ 4. A petition for a preliminary injunction is addressed to the sound discretion of the trial court, *Evening News Publishing Company v. Allied Newspaper Carriers of New Jersey,* 149 F.Supp. 460, 462 (D.N.J.1957), and such relief should be granted only when it is necessary to preserve the status quo during the pendency of an action so as to avoid irreparable harm.

5. Plaintiffs allege that N.J.A.C. 13:70–14A.10 and 14A.11 violate their rights guaranteed by the Fourth, Fifth, and Ninth Amendments and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. Specifically, plaintiffs argue that defendants:

(a) subject jockeys to unreasonable searches and seizures;

(b) require the disclosure of private medical information, potentially relevant to violations of the criminal law of the State of New Jersey, without adequate safeguards for maintaining its confidentiality;

(c) fail to provide a hearing during which plaintiffs can challenge the results of the breathalyzer and urine tests; and

(d) discriminate against jockeys as a group by singling them out for breathalyzer and urine testing.

The court will address the strength of the plaintiffs' claims *seriatim.*

6. *The Search and Seizure Claim.* The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The essential purpose of the proscriptions in the Fourth Amendment is to "impose a standard of 'reasonableness' upon the exercise of discretion by government officials," including law enforcement agents and state regulatory personnel, in order to "safeguard the privacy and security of individuals against arbitrary intrusions...." *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Marshall v. Barlow's Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Thus, the Fourth Amendment protects individuals from "unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977).

■ Except in certain carefully limited classes of cases, a search of private property or person without consent is "unreasonable" unless it has been authorized by a valid search warrant. *See Marshall, supra.* An exception to the search warrant· requirement has been recognized for "pervasively regulated businesses" and for "closely related" industries "long subject to close supervision and regulation." *Id.; United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970). These cases are indeed exceptions,

> but they represent responses to relatively unique circumstances. Certain industries have such a history of government oversight that no reasonable expectation of privacy * * * could exist for a proprietor over the stock of such an enterprise. Liquor (*Colonnade*) and firearms (*Biswell*) are industries of this type; when an entrepreneur embarks upon such a

business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation.

Industries such as these fall within "certain carefully defined classes of cases," referenced in *Camara*, 387 U.S., at 528, 87 S. Ct., at 1731. The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware ... businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade ... The businessman in a regulated industry in effect consents to the restrictions placed upon him.

*Marshall, supra* 436 U.S. at 313, 98 S.Ct. at 1821.

Horse racing meets *both* exceptions to the search warrant requirement articulated above. This industry has been subject to "pervasive *and* long standing regulation by New Jersey." *State v. Dolce*, 178 N.J.Super. 275, 283–85, 428 A.2d 947 (App.Div. 1981) (emphasis added).

The State has had and continues to have a vital interest in the horse racing industry, particularly with respect to maintaining its integrity. *Jersey Downs, Inc. v. New Jersey Racing Commission*, 102 N.J.Super. 451, 457 [246 A.2d 146] (App. Div.1968). Consequently, our legislature has established the Racing Commission and vested in it the power and duty to govern all aspects of horse racing in this State, including all those working in the industry. N.J.S.A. 5:5–22. To this end, the Racing Commission was granted broad rule-making powers to protect the state's interest in the industry and to carry out its statutory mandate. N.J. S.A. 5:5–30.

*Dolce, supra* at 284–85, 428 A.2d 947; *see also Biswell, supra* 406 U.S. at 316, 92 S.Ct. at 1596 (firearms); *Colonnade, supra* 397 U.S. at 77, 90 S.Ct. at 777 (liquor); *In re Martin*, 90 N.J. 295, 313, 447 A.2d 1290 (1982) (casino gambling); *State v. Williams*, 84 N.J. 217, 223–25, 417 A.2d 1046 (1980) (liquor); *Jersey Downs, Inc., supra* 102 N.J.Super. at 457, 246 A.2d 146 (horse racing); *Niglio v. New Jersey Racing Commission*, 158 N.J.Super. 182, 188, 385 A.2d 925 (App.Div.1978) (horse racing).

While horse racing comes within the recognized exception to the administrative search warrant rule, the court must still address whether the state's regulations which provide for the use and administration of breathalyzer tests and urinalyses meet the "reasonableness" test of the Fourth Amendment. As the Supreme Court has noted,

[Reasonableness] is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). *See also Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (Court must balance the interest in human dignity and privacy against the reasonableness of the test and the reasonableness of the manner in which the test is conducted); *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (Due process of law precludes defining, and therefore confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend "a sense of justice"). The courts have used this standard to differentiate between levels and degrees of intrusiveness among searches and seizures. As measured by the degree of invasion, inspections of personal effects are generally least intrusive, while breaches of the "integrity of the body" result in the greatest invasion of privacy. The court, of course, must also consider an individual's reasonable expectations of privacy under the circumstances. In other

words, the court must balance the competing interests involved on a case-by-case basis.

Plaintiffs rely heavily on a recent Second Circuit case in arguing that the New Jersey Racing Commission's drug and alcohol testing program is unconstitutional. *See Security and Law Enforcement Employees, District Council 82 v. Carey*, 737 F.2d 187 (2nd Cir.1984). In *Security and Law Enforcement Employees*, the state adopted a system of random "strip searches" and "visual body cavity searches" of state correctional officers in an effort to reduce the smuggling of contraband into state penal institutions.[1] The court recognized the uniqueness of the correctional institutions involved, the deference traditionally afforded prison administrators by the courts, the legitimate government interest in the maintenance of stability, security, and order in its correctional facilities, and a corrections officer's diminished expectations of privacy while at work in the penal institution. Nevertheless, the court also recognized the uniquely intrusive nature of a strip search and visual body cavity search, and, despite the significant government interests involved, held that such searches required the presence of "reasonable suspicion" of wrongdoing prior to their utilization. *Id.* at 203.

█ Likewise, the Ninth Circuit, in a series of cases within the special context of border searches under the Fourth Amendment, differentiated between strip and body cavity searches and less intrusive searches. Government agents could require one who crosses the border, without more, to submit the contents of his baggage for inspection. A simple pat down search requires a "minimal showing of suspicion." A strip search requires "real suspicion," and a body cavity search and/or x-ray examination can be conducted only in the presence of a "clear indication that the suspect is carrying contraband in a body cavity." *United States v. Des Jardins*, 747 F.2d 499, 504–05 (9th Cir.1984). *See also*

*United States v. Asbury*, 586 F.2d 973, 975 (2nd Cir.1978) (To conduct a strip search at a border crossing, the government agent "should have a suspicion of illegal concealment that is based on something more than the border crossing....").

█ The court finds that plaintiffs fail to demonstrate that the Racing Commission's breathalyzer testing and urinalysis program is not closely tailored to further the state's legitimate interest in reducing the use of alcoholic beverages and drugs, thereby promoting the safety and integrity of horse racing and protecting the public.

First, the regulations contested by plaintiffs were promulgated for the specific purpose of combatting and hopefully eliminating the perceived and actual use of alcohol and drugs which plagues this sport, as well as so many others. Use of drugs and alcohol by jockeys increases significantly the probability that serious injuries and death will occur during the race, as a result of single and multi-horse accidents. The state argues that the testing regimen previously used proved ineffective and failed to stop or reduce the use of these substances. As a result, the state has issued new regulations which may increase the likelihood of success and which provide for such testing at the direction of the State Steward when it appears most efficacious—at the track, proximate to race time. In this respect, the court notes that "substantially identical regulations are in effect for the testing of harness drivers" in New Jersey. The harness breathalyzer rule has been in effect for several years. Harness drivers have been required to submit to random post-race urine tests since January 1985. Affidavit of John F. Higgins, Administrative Secretary of the Standard-bred Breeders and Owners Association of New Jersey, Inc., May 1, 1985, at ¶ 3. From June, 1982 to the present, 385 tests have been conducted on harness drivers on a random basis, using the Enzyme Multiplied Immunoassay Technique System of analysis. Thirty-five of these tests, more than eight percent,

---

1. The court defined "strip searches" as "inspections of the naked body of the person searched," and "visual body cavity searches" as "visual inspections of the anal and genital areas."

proved positive. Readings ranged from marijuana to heroin use. Affidavit of Charles F. Bradley, Assistant Director of the New Jersey Racing Commission, May 6, 1985, at ¶¶ 3, 4.

Second, these tests as applied to jockeys are not unique. Boxing is also a heavily regulated industry in New Jersey, with boxers being subject to stringent regulations and testing as to their physical fitness to compete. All boxers must undergo physical examinations on the day of the bout "both at weigh in and in the evening, a short while before the boxing program commences." These tests include blood samples, and "[i]n all cases ... a thorough ophthalmological and neurological examination and a urinalysis." N.J.A.C. 13:46–12.-2(a). A boxer may be disqualified for any medical reason. N.J.A.C. 13:46–12.2(b). The boxer "must submit to any prefight or postfight urinalysis or other laboratory procedure ordered by the physician appointed by the Commissioner to detect the presence of any drug. Refusal to submit to such testing shall result in the immediate disqualification of the boxer from the match and an indefinite suspension from boxing." N.J.A.C. 13:46–12.3.

Third, while the Supreme Court has refrained from drawing bright lines among searches, breathalyzer tests and urinalyses are considered less intrusive than body cavity and strip searches and those searches which have been identified as intruding upon the "integrity of the body," *see Schmerber, supra; United States v. Ramsey,* 431 U.S. 606, 618 n. 13, 97 S.Ct. 1972, 1979 n. 13, 52 L.Ed.2d 617 (1977); *Des Jardins, supra;* and therefore, (1) are distinguishable from *Security and Law Enforcement Employees, supra,* on the facts and (2) fully consistent with the logic of *Des Jardins'* heirarchy of suspicion. While breathalyzer and urine tests require the

individual involved to "give up" something, the intrusion is less than the involuntary securing of a blood sample or other searches into which an intrusion into the body is required.[2]

Fourth, jockeys have diminished expectations of privacy as to these job related searches and seizures. The jockeys admit to the pervasive historical regulation of their industry:

> Jockeys, like other athletes have always been subject to medical examinations or testing where they exhibited some physical symptomatology indicating a potential problem with their riding performance.

Plaintiffs' Brief at 16–17. The state's regulations go one step further by permitting the random examination of jockeys at the direction of the Steward. Jockeys are licensed by the State to race in New Jersey, subject to the extensive and detailed conditions and regulations in effect. By securing their licensure, jockeys accept the unique benefits as well as the burdens of their trade. They have notice that the state has regulations which concern aspects of their physical and mental fitness to ride. This includes alcohol and drug use which impedes their riding performance. The state has a legitimate interest in ensuring the health and safety of all participants and in preserving the integrity of the gambling industry as a whole. *See Dolce, supra* (horse racing); *Jersey Downs, supra* (horse racing); *Niglio, supra* (horse racing); *Martin, supra* (casino gambling). *See also Biswell, supra* (If firearms inspection is to serve as an effective deterrent, "unannounced, even frequent inspections are essential"); *Colonnade, supra* (Congress has broad authority over the liquor industry to fashion standards of reasonableness over searches and seizures). *Cf. Prouse, supra* (Automobile operators do

**2.** Despite the intrusion, the Supreme Court has upheld the involuntary taking of a blood sample under certain circumstances. *See, e.g., Schmerber, supra* (physician acting under police direction can take a blood sample from an objecting defendant where delay in obtaining a search warrant threatened to destroy the evidence);

*Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (blood sample taken from an unconscious person permitted because the "interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road" outweighed "so slight an intrusion into the body.")

not lose all expectations of privacy because automobile use is subject to government regulation. "Auto travel is a basic, pervasive and often necessary mode of transportation to and from one's home, workplace, and leisure activities ..."). By adopting these regulations the state has embarked upon a unique regulatory program, rehabilitative rather than penal in nature.

The court is reluctant, without a greater showing by plaintiffs, to enjoin part of an extensive state regulatory scheme, especially when such action may be perceived by the public as undermining the ability of the Racing Commission to adequately police this industry or the public's confidence in the Racing Commission's ability to do its job. The court finds that, at this point, plaintiffs have failed to meet their burden to demonstrate a probability of success on the merits, that plaintiffs will suffer any irreparable harm as a result of continued testing during the duration of this litigation, and that the public interest in the integrity and safety of thoroughbred racing will be served by an injunction. Therefore, the court denies plaintiffs' motion for a preliminary injunction preventing the enforcement of N.J.A.C. 13:70–14A.10 and 13:70–14A.11.

7. *The Privacy Claim.* The state forbids plaintiffs from using any Controlled Dangerous Substances, as defined by N.J.S.A. 24:21–1 *et seq.*, or prescription legend drugs, unless obtained directly or pursuant to a valid prescription or order from a licensed physician. Plaintiffs must give the State Steward notice of such use. N.J.A.C. 13:70–14A.11(a). Plaintiffs must fill out a form (*see* Appendix B attached hereto), which asks for the names of prescribed medications, the names of the persons who prescribed them, what each prescription treats, and the date and time of the last dosage of each medication taken. The form also requires that plaintiffs provide the names of over-the-counter medications used, what these medications treat, and the date and time of the last dosage. Plaintiffs argue that the regulation (1) forces jockeys to divulge private, personal medical information without sufficient justification,

(2) forces jockeys to divulge information which could incriminate them under the laws of New Jersey, and (3) fails to provide adequate provisions and safeguards to prevent the disclosure of such information to the public and members of their profession.

 While the constitution does not explicitly state that there is a right to privacy, a constitutional doctrine has been established and expanded "variously described as recognizing a right to privacy." *McKenna v. Fargo,* 451 F.Supp. 1355 (1978); *see Carey v. Population Services Int'l,* 431 U.S. 678, 684–86, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977); *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). There is a privacy interest in avoiding disclosure to government agents of personal medical information. *Whalen, supra* at 608–09, 97 S.Ct. at 881. However, this privacy interest is not absolute and must be balanced against the legitimate interests of the state in securing such information. The regulations must be narrowly tailored to "express only those compelling state interests." *McKenna, supra* at 1381; *Dolce, supra.* The extent of the plaintiffs' privacy interests must be judged in light of the statutory safeguards against disclosure. *Whelan, supra; Lehrhaupt v. Flynn,* 140 N.J.Super. 250, 260–63, 356 A.2d 35 (App.Div.1976), *aff'd,* 75 N.J. 459, 383 A.2d 428 (1978). The state must use the narrowest means consistent with the maintenance of its legitimate interests. *Martin, supra; Lehrhaupt, supra* at 262, 264, 356 A.2d 35; *Kenny v. Byrne,* 144 N.J.Super. 243, 253, 365 A.2d 211 (App.Div.1976), *aff'd,* 75 N.J. 458, 383 A.2d 428 (1978).

In *Whalen,* the Supreme Court held that disclosure of an individual's name, age, address, and use of a certain drug did not (1) unduly burden his privacy interest nor (2) differ significantly from the disclosures of private medical information requested by insurance companies and hospital personnel. *Whalen, supra* 429 U.S. at 608, 97 S.Ct. at 881. In *Martin,* the New Jersey Superior Court upheld the use of a casino

license form pursuant to the Casino Control Act, holding that none of the challenged questions were "so personal" as to permit the assertion of a right of selective disclosure. The questions on the casino license form concerned "predominantly information of public record." *Martin, supra,* 90 N.J. at 321–22, 447 A.2d 1290. In *McKenna,* the United States District Court for the District of New Jersey found that the degree and character of the required medical disclosure was "far greater and more intrusive" than in *Whalen. McKenna, supra* at 1381. The Jersey City Fire Department required a thorough psychological examination as a prerequisite to employment. The court found that:

> The evaluation looks deeply into an applicant's personality, much as a clinical psychologist would if requested to do so by an applicant. Fire-fighter candidates are called upon to reveal the essence of their experiences of life, the collective stream of thoughts and feelings that arise from the ongoing dialogue which individuals carry on between the world and themselves in the privacy of their being.

*Id.* However, the court found the state's interest in the medical disclosure sufficiently compelling to override the applicant's privacy interests:

> The life of a community, as well, depends, at the most basic level, on those whose job it is to protect the community from physical forces, like fire, that have escaped from the control that makes them productive. Property, and the security of the community, as well as lives, are at stake in improving the fire department. The state interest is compelling, indeed ... and is served by the challenged evaluation and hiring procedure.

*Id.* at 1381.

██ The state's disclosure form, by asking jockeys to provide the nature of the illness requiring treatment by prescription drug, is more intrusive than the disclosures discussed in *Whalen* and *Martin, supra.* For example, if a jockey takes anti-psychotic medications, he would be required to divulge, if applicable, that he suffers from certain mental illnesses or diseases. The court recognizes that the Racing Commission has a legitimate safety interest in preventing the use of Dangerous Controlled Substances by jockeys. The disclosure of certain medical information, and the forms utilized for that disclosure, furthers that stated purpose. The court does not find persuasive the state's arguments that it has tailored the disclosure form so as to avoid unnecessarily intruding into private medical matters which are not germane to the furtherance of the state's articulated interests. These medical forms require jockeys to disclose within the sections marked "For Treatment Of" the illness or conditions for which a particular drug has been prescribed or used. The regulation is designed to prevent the illicit use of drugs and to aid in the proper detection of that use. The court questions whether such disclosure will further the state's professed goals. In fact, such disclosure is not required on the face of the regulations issued by the Racing Commission. The state argues that the jockeys may, at their option, choose to leave the "For Treatment Of" sections blank when they complete these forms. Consistent with the state's representations as to this aspect of the controversy, the court directs the Racing Commission to insert the word "optional" in the "For Treatment Of" sections of the disclosure form, thereby clearly indicating to jockeys that they may leave the objectionable sections empty.

Plaintiffs also argue that the regulations do not clearly safeguard against the disclosure of information obtained by the testing program or the medical forms. The regulations do provide that the results of urine tests shall be treated as confidential *"except* for their use with respect to a ruling issued pursuant to this rule." Access to the results of "positive" urine tests "shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee and the subject jockey, *except* in the instance of a contested matter." N.J.A.C. 13:70–14A.11(a) & (e) (emphasis added). The defendants have represented to this court

that they wish to do everything possible to preserve the confidentiality of the medical information collected pursuant to the regulations. The Racing Commission will not share any data collected with any state agency charged with the enforcement of New Jersey's criminal laws. Such information is gathered with "rehabilitative" and not "penal" purposes in mind.

Under the circumstances, plaintiffs have failed to persuade the court that they are likely to prevail on the merits of their privacy claims. Therefore, the court will deny plaintiffs' motion for a preliminary injunction and will vacate the Temporary Restraining Order entered on April 24, 1985.[3]

 8. *The Due Process Claim.* Plaintiffs also allege that the regulations fail to provide a hearing at which plaintiffs can challenge the results of the breathalyzer and urine tests. The Racing Commission does provide a hearing, however, for jockeys wishing to challenge the results of the tests—at the jockeys' request. Affidavit of Bruce H. Garland, ¶ 9.

 9. *The Equal Protection Claim.* Plaintiffs also allege that the regulations discriminate against jockeys by singling them out as a group for breathalyzer and urine testing, without a rational basis or compelling interest to do so. The state has a legitimate safety interest in testing the jockeys in order to reduce the possibility of accidents and even death while racing.

10. *Conclusion.* In summary, the court denies plaintiffs' motion for a preliminary injunction in its entirety. The court orders defendants to insert the word "optional" in the "For Treatment Of" sections of the medical disclosure form. The court will hear this matter on an expedited basis according to the following schedule: parties will attend a Scheduling Conference with United States Magistrate Jerome B. Simandle on May 20, 1985, at 3:00 p.m.; the

Joint Final Pre-Trial Order will be entered on June 7, 1985; the court will schedule a full hearing for June 18, 1985 at 9:30 a.m. An appropriate order will be entered.

## APPENDIX A

(a)

### NEW JERSEY RACING COMMISSION

Thoroughbred Rules:

Breathalyzer Test; Urine Test

Adopted New Rules: N.J.A.C. 13:70–14A.10 and 14A.11 (proposed as 13:70–14A.13 and 14A.15)

Proposed: June 18, 1984 at 16 N.J.R. 1457(a).

Adopted: January 14, 1985 by New Jersey Racing Commission, Harold G. Handel, Executive Director.

Filed: January 28, 1985 as R.1985 d.57, without change.

Authority: N.J.S.A. 5:5–30.

Effective Date: February 19, 1985.

Operative Date: April 1, 1985.

Expiration Date pursuant to Executive Order No. 66 (1978): February 19, 1990.

Summary of Public Comments and Agency Responses: No comments received.

Full test of the adoption follows.

13:70–14A.10 Breathalyzer test

Officials, jockeys, trainers and grooms shall, when directed by the State Steward, submit to a breathalyzer test and if the results thereof show a reading of more than .05 percent of alcohol in the blood, such person shall not be permitted to continue his duties. The stewards may fine or suspend any participant who records a blood alcohol reading of .05 percent or more. Any participant who records a reading above the prescribed level on more than one occasion shall be subject to expulsion, or such penalty as the stewards may deem appropriate.

---

**3.** The court believes that the Racing Commission can take affirmative, immediate measures to clarify any ambiguities which may exist. The Commission's regulations should contain provisions governing the storage of and access to the information collected, the length of time data

will be kept, and the precautions utilized to safeguard the information from disclosure. Should defendants fail to take measures to remedy existing ambiguities from the regulations, the court reserves its right to reconsider injunctive relief.

13:70–14A.11 Urine test

(a) No jockey shall use any Controlled Dangerous Substance as defined in the "New Jersey Controlled Dangerous Substance Act", N.J.S.A. 24:21–1, et seq. or any prescription legend drug, unless such substance was obtained directly, or pursuant to a valid prescription or order from a licensed physician, while acting in the course of his professional practice. It shall be the responsibility of the jockey to give prior notice to the State Steward that he is using a Controlled Dangerous Substance or prescription legend drug pursuant to a valid prescription or order from a licensed practitioner.

(b) Every jockey for any race at any licensed racetrack may be subjected to a post-race urine test, or other non-invasive fluid test at the direction of the State Steward in a manner prescribed by the New Jersey Racing Commission. Any jockey who fails to submit to a urine test when requested to do so by the State Steward shall be liable to the penalties provided in N.J.A.C. 13:70–31.

(c) Any jockey who is requested to submit to a post-race urine test shall provide the urine sample, without undue delay, to a Chemical Inspector of the Commission. The sample so taken shall be immediately sealed and tagged on the form provided by the Commission and the evidence of such sealing shall be indicated by the signature of the tested jockey. The portion of the form which is provided to the laboratory for analysis shall not identify the individual jockey by name. It shall be the obligation of the jockey to cooperate fully with the Chemical Inspector in obtaining any sample which may be required and to witness the securing of such sample.

(d) A "positive" Controlled Dangerous Substance or prescription drug result shall be reported, in writing, to the Executive Director or his designee. On receiving written notice from the official chemist that a specimen has been found "positive" for controlled dangerous substance, or pre-

scription legend drug, the Executive Director or his designee shall proceeds follows:

1. He shall, as quickly as possible, notify the jockey involved, in writing;

2. For a jockey's first violation, he shall issue a written reprimand and warning and notify the jockey that he will be subject to mandatory drug testing and that any further violation shall result in the sanctions described in paragraphs (3) and (4) below;

3. For a jockey's second violation, he shall require the jockey to enroll in a Supervisory Treatment Program approved by the New Jersey Racing Commission upon such reasonable terms and conditions as he may require. The jockey shall be permitted to participate unless his continued participation shall be deemed, by the Executive Director of his designee, to be detrimental to the best interests of racing. It shall be the jockey's responsibility to provide the Commission with written notice of his enrollment, weekly status reports, and written notice that he has successfully completed the program and has been discharged. If a jockey fails to comply with these requirements, he shall be liable to the penalties provided in N.J.A.C. 13:70–31.

4. For a jockey's third or subsequent violation, he shall be liable to the penalties provided in Subchapter 31 and may only enroll into a Supervisory Treatment Program in lieu of said penalties, with the approval of the New Jersey Racing Commission.

(e) The results of any urine test shall be treated as confidential, except for their use with respect to a ruling issued pursuant to this rule, or any administrative or judicial hearing with regard to such a ruling. Access to the reports of any "positive" results shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee and the subject jockey, except in the instance of a contested matter.

APPENDIX B

DATE _____ TRACK _____

JOCKEY'S NAME _____

I AM ☐
AM NOT ☐

Taking prescription medication or over the counter medication. If you are taking either or both of the above complete the following

Name of Prescribed medication(s) _____
_____
_____

Prescribed By: _____

For Treatment Of: _____

Last Dose: Time: _____ Date: _____

Name of Over-the-Counter Medication: _____
_____
_____

For Treatment Of: _____

Last Dose: Time: _____ Date: _____

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signature: _____