211 N.J. Super. 54 (1985)
510 A.2d 709
CARLA ODENHEIM BY HER GUARDIAN AD LITEM PILAR ODENHEIM, INDIVIDUALLY; ERICH ODENHEIM, INDIVIDUALLY; PILAR ODENHEIM, INDIVIDUALLY; MICHAEL HAVEL AND CATHLEEN HAVEL, BY THEIR GUARDIAN AD LITEM JAMES HAVEL, JAMES HAVEL, INDIVIDUALLY; MICHELLE CAMPBELL, BY HER GUARDIAN AD LITEM JUDITH CAMPBELL, INDIVIDUALLY; JUDITH CAMPBELL, INDIVIDUALLY; MARESSA DOLCEMACOLO, BY HER GUARDIAN AD LITEM PATRICIA DOLCEMACOLO, INDIVIDUALLY; AND PATRICIA DOLCEMACOLO, INDIVIDUALLY, PLAINTIFFS,
v.
CARLSTADT-EAST RUTHERFORD REGIONAL SCHOOL DISTRICT; JOSEPH MASTBETH, WILLIAM HRYCAK, SUSAN MILANO, HARRIET WAGNER, ROSEMARIE GENTILE, WILLIAM PROVOST, MARK RAMSAY, ADELE DEMPSEY AND RICHARD VARTAN IN THEIR OFFICIAL CAPACITY AS DIRECTORS OF THE CARLSTADT-EAST RUTHERFORD REGIONAL SCHOOL DISTRICT; AND ALFRED MARBAISE, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF THE CARLSTADT-EAST RUTHERFORD REGIONAL SCHOOL DISTRICT, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Bergen County.
Decided December 9, 1985.
*55 John L. Weichsel for plaintiffs.
Dennis A. Maycher for defendants.
Daniel J. Popeo and George C. Smith for Amicus Curiae Washington Legal Foundation.
CIOLINO, A.J.S.C.
The material facts in this case are not in dispute. On August 7, 1985, the Carlstadt-East Rutherford Regional Board of Education (Board of Education) adopted Policy Number 5141.3 to its present policy manual. (See appendix.) This new policy, entitled "Comprehensive Medical Examination," required physicals of all students enrolled or to be enrolled in the school district. It provided that these physicals were to occur annually in or about the month of September, effective for the ensuing school year, and would consist generally of on-premise examinations by the school medical examiner and/or his appointees. The Policy further provided "these examinations are designed to identify the existence of any physical defects, illnesses or communicable diseases, as well as, but not limited to, the pupil's fitness to participate in any school-sponsored health, safety, sport and/or physical education courses as required by law." Carlstadt-East Rutherford Regional Board of Education, Policy No. 5141.3 (Introduction). It continued by stating, "These complete physical examinations will help to identify any *56 drug and alcohol use by the pupils. The detection of drug and/or alcohol use will enable the Board of Education to enter the pupil into an appropriate rehabilitation program designed to help the student recognize the danger and to remedy any problem that exists." Id. at Introduction.
In addition to other more traditional medical tests, the comprehensive medical examinations included drug screening designed to detect the presence of controlled dangerous substances. Section two of the Administrative Procedures for Policy, in sub-section C described the urine test to be done as a part of the physical. It states:
In the same manner and environment as above indicated, the medical examiner shall ask each pupil for a urine sample, to be obtained in a medically appropriate method. The sample shall be obtained for the purpose of discerning the level of protein, sugar, specific gravity, blood and the existence or non-existence of controlled dangerous substances, non-authorized prescription drugs as defined in the introductory statement, and alcohol. [Id. at Section 2(c).]
A controlled dangerous substance is defined by the Policy as "a narcotic or non-narcotic substance as listed under N.J.S.A. 24:21-4, N.J.A.C. 8:65-10.1 and any prescription drug not prescribed or authorized by a medical physical." Id. at Introduction. Included among the administrative procedures for Policy 5141.3 is a section dealing with notice, conduct of the examination, private comprehensive medical examination, refusal to comply with any aspect of the comprehensive medical examination, comprehensive medical examination tests, and a clause dealing with severability.
Policy 5141.3 is totally encompassed within its four corners. Counsel for the defendants has acknowledged that there are no additional statements of policy in existence concerning Policy 5141.3 nor had the Board of Education issued any other policy statements.
Plaintiffs, a group of students attending Becton Regional High School and their parents, challenged Policy 5141.3, and on August 13, 1985, a temporary restraining order was granted, which enjoined the testing of any urine sample collected pursuant to the Policy for the presence of drugs. On September 3, *57 1985, the temporary order was converted to a preliminary injunction.
At trial, the parties stipulated that the student population of defendant high school was 520 for the school year September 1984 to June 1985, and 516 for the current school year. They further stipulated that for the school year September 1984 to June 1985, some 28 students either made inquiry or were referred to the student assistant counsellor and eleven in the September 1985 school year to date for drug or alcoholic inquiry or counseling. Included in this statistic were students who denied any involvement in either alcohol or drugs and others who received follow-up referral service.
Defendants contend that the urine sample is not being taken solely for the purpose of drug screening but that this very same sample is also tested for other forms of physical defects as part of the pupil examination mandated by N.J.S.A. 18A:4-4. Defendants further contend that in light of the fact that the urine sample is taken for a number of traditional medical tests and that no civil or criminal sanctions are imposed in the event of a positive test, no intrusive deprivation of privacy occurs when the specimen is examined for the presence of drugs and/or alcohol. It is their position that the testing for drug and/or alcohol use is strictly a medical procedure since in the case of a positive urine test, the doctor, parent and student will discuss whether or not there is a problem. Further, the files maintained in accordance with the Policy will be kept confidential and separate from the mandatory school files required for each student. It is also provided that upon the advice of the school physician, the superintendent will make recommendations necessary to facilitate the effective rehabilitation of the pupil. Policy 5141.3 provides that these recommendations shall be dependent in all instances upon the nature of the medical problem or potential drug and/or alcohol problem, and the cooperation received from the parent or legal guardian and pupil. The recommendations may include, but are not limited to, periodic parental conferences, referral to the district's internal *58 alcohol or drug supervision program, referral of the case to the Bergen County District Office of the Division of Youth and Family Services and other general conditions and/or recommendations allowed by law including the scheduling of subsequent periodic medical testing. The linchpin of defendants' argument is that drug use and/or abuse is an illness and/or a departure from normal health and therefore beyond the parameters of the law of search and seizure.
In accordance with present State policy, a physical examination is required pursuant to a Board of Education obligation under N.J.S.A. 18A:40-4 to ensure the physical fitness of all students. The defendants maintain that in view of this State policy, the sanction of exclusion from class for failure to submit to the exam or to provide an incomplete exam can be distinguished from that of a suspension or expulsion of a student in accordance with N.J.S.A. 18A:37-2. Under this statute, certain due process rights, including the right to be heard, must be afforded. Policy 5141.3, Section 4 provides, in sub-Section A, for the exclusion from classroom study of any student who does not provide a complete physical examination. It further states that the parent or legal guardian of the pupil will be advised of a penalty which may be imposed upon the parent or legal guardian pursuant to N.J.S.A. 18A:40-9 when such parent or legal guardian fails, within a reasonable time, to remedy the cause for exclusion.
The Policy is challenged on the basis that it violates Article I, paragraphs 1, 2, 3, 4, 5 and 7 and the Preamble of the New Jersey Constitution (1947), and the First, Third, Fourth, Fifth, Ninth and Fourteen Amendments, and the Privileges and Immunities Clause of Article IV of the United States Constitution and further that it is preempted by various state statutes. However, the primary focus of the plaintiffs' attention is upon the Policy's alleged violation of both Federal and State Constitutional proscription against unreasonable search and seizure and what plaintiffs describe as general searches of student *59 plaintiffs' bodies under the subterfuge of forced medical examination.
The United States Constitution proclaims that, "the right of people to be secure ... against unreasonable searches and seizures shall not be violated." U.S. Const., Amend. IV; N.J. Const. (1947), Art. I, par. 2. Defendants contend that no individual suspicion is required because all students will be tested under Policy 5141.3 without discretion vested in any school official. The constitutional proscription against unreasonable search and seizure is not limited to only those who are suspected of criminal behavior. Instead, all searches by government officials, including inspections for administrative purposes, must satisfy constitutional reasonableness standards. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).
The Fourth Amendment's prohibition against unreasonable searches and seizures clearly applies to searches conducted by public school officials. In New Jersey v. T.L.O., ___ U.S. ___, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985), Justice White stated, "[a]lthough this Court may take notice of the difficulty of maintaining discipline in the public schools today, the situation is not so dire that students in the schools may claim no legitimate expectations of privacy."
We receive guidance as to the definition of "reasonableness" from the Supreme Court when they state:
[Reasonableness] is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. [Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); see also, Camara, 387 U.S. at 536-537, 87 S.Ct. at 1734-1735]
The Court in T.L.O. noted that "[o]n one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other the government's need for effective methods to deal with the breaches of public order." T.L.O., 105 S.Ct. at 741. "In other words, the court must *60 balance the competing interests involved on a case by case basis." Shoemaker v. Handel, 608 F. Supp. 1151, 1156-1157 (D.N.J. 1985).
"Of course, the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise `illegitimate.' [Citations omitted] To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is `prepared to recognize as legitimate.'" T.L.O., 105 S.Ct. at 742 (quoting Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984).
What reasonable expectations of privacy does a public school pupil have in regard to urine testing for drugs and alcohol? Both plaintiffs and defendants cite two other cases involving urine testing. In McDonell v. Hunter, 612 F. Supp. 1122 (S.D. Iowa 1985), the court dealt with the examination of the urine of a corrections officer who was suspected of drug involvement. In the other case, Shoemaker, the issue was whether licensed jockeys should have their urine tested to determine drug and/or alcohol abuse. In Shoemaker, Judge Brotman noted that:
[a]n exception to the search warrant requirement has been recognized for `pervasively regulated businesses' and for `closely related' industries `long subject to close supervision and regulation.' [citations omitted] The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware ... businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade .. . The businessman in a regulated industry in effect consents to the restrictions placed upon him. [Shoemaker, 608 F. Supp. at 1155-1156]
In both the aforementioned cases the court held that horseracing and corrections employment satisfy the requirements needed to meet the balancing test and that the testing would be permitted.
Certainly, the facts that the court considered in McDonell, which involved a corrections environment that is, by its nature, fraught with danger and where security is a paramount consideration, and Shoemaker, where a heavily regulated industry, long subject to supervision and regulation was concerned are *61 distinguishable and inappropriate to use in measuring the reasonable privacy expectations of a young high school student.
The Court in T.L.O. stated:
We join the majority of courts that have examined this issue in concluding that the accommodation of the privacy interests of school children with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider `whether the ... action was justified at its inception, [Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)]; ... second, one must determine whether the search as actually conducted `was reasonably related in scope to the circumstances which justify the interference in the first place,' [Id. at 20, 88 S.Ct. at 1879]. Under ordinary circumstances, a search of a student by a teacher or other school official will be `justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction. [T.L.O., 105 S.Ct. at 743-744 (footnotes omitted)]
Assuming arguendo, that this is strictly and solely a medical examination to inquire into a medical condition, a position which this Court does not accept, I would still find that their activities violate the reasonable privacy expectations of school children. The defendants' activities are not reasonably related in scope to the circumstances which initially justified the interference. School policy already provides for exclusion and/or suspension of students who are involved with drug activity. The raw numbers and percentages of students referred to a student assistance counseling as compared with the total student body is not reasonably related in scope to the circumstances which justified the interference, urinalysis, in the first place.
Present State and Board of Education policy provide for expulsion and/or suspension of students involved in illicit drug activity. N.J.S.A. 18A:37-2(j); Board of Education, Policy No. 5114. New Jersey Courts have mandated that such policy must "be construed to require public school officials to afford students *62 facing disciplinary action involving possible imposition of serious sanctions, such as suspension or expulsion, the procedural due process guaranteed by the Fourteenth Amendment." R.R. v. Bd. of Ed., Shore Re. H.S., 109 N.J. Super. 337, 347 (C.D. 1970); Tibbs v. Board of Ed. of Franklin Tp., Somerset County, 59 N.J. 506 (1971).
Defendants maintain that exclusion of students pursuant to Policy No. 5141.3 is distinguishable from expulsion or suspension of students under N.J.S.A. 18A:37-2(j) as the former is for medical reasons, while the latter is purely disciplinary. The attempted distinction is unacceptable. Defendants' policy is an attempt to control student discipline under the guise of a medical procedure, thereby circumventing strict due process requirements. Indeed, in light of the Board of Education's proposed use of urinalysis to further Policy 5141.3, this Court suggests that the spectrum of items that could be approached simply by defining them as medical is limitless. To accept defendants' position suggests that medical testing is without limits. The Board of Education's use of an exclusion to prohibit class attendance which does not provide for the due process mandated by R.R. and Tibbs fails to pass constitutional muster.
For the reasons set forth herein, it is the finding of this Court that Policy 5141.3 violates plaintiffs' right to be free of unreasonable search and seizure, violates plaintiffs' rights to due process and violates the plaintiffs' legitimate expectation of privacy and personal security.
Judgment is to be entered on behalf of the plaintiffs and as against the defendants. Counsel for the plaintiffs shall prepare the necessary order.

APPENDIX A

POLICY NUMBER 5141.3

COMPREHENSIVE MEDICAL EXAMINATION
Pursuant to N.J.S.A. 18A:40-4, the Carlstadt-East Rutherford Regional Board of Education requires physicals of all *63 students enrolled or to be enrolled in the school district. These physicals shall occur annually in or about the month of September, effective for the ensuing school year, and shall generally consist of on-premises examinations by the school medical examiner and/or appointees. These examinations are designed to identify the existence of any physical defects, illnesses or communicable diseases, as well as, but not limited to, the pupil's fitness to participate in any school sponsored health, safety, sport and/or physical education courses as required by law.
Commencing with the 1985-1986 school year, the aforementioned comprehensive medical examinations shall include such tests as set forth in Schedule A attached hereto. These comprehensive medical examinations shall also include drug screening for detection of the presence of controlled dangerous substances. A controlled dangerous substance shall be defined as a narcotic or non-narcotic substance as listed under N.J.S.A. 24:21-4, N.J.A.C. 8:65-10.1, and any prescription drug not prescribed or authorized by a medical physician.
The Board of Education has concern for the health of the entire school population and hereby resolves to identify and isolate any and all health problems which presently exist. These complete physical examinations will help to identify any drug and alcohol use by the pupils. The detection of drug and/or alcohol use will enable the Board of Education to enter the pupil into an appropriate rehabilitation program designed to help the student recognize the danger and to remedy any problem that exists.
The within policy does not have a punitive purpose. The Board believes it is in the pupil's best interest to isolate this potential health hazard found in young teens. Seeking the cooperation of parents and local health agencies, and developing the appropriate rehabilitative procedures will forward the Board's responsibility to maintain a safe and healthy district which will ensure the academic development of all students. *64 The above policy is not to be read together with the present Board policy concerning instances of substance abuse on school premises contained in Section 5131.6 of the Policy Manual, and adopted in accordance with N.J.S.A. 18A:40-4.1. The prevailing intention here is to provide comprehensive medical examinations of all pupils in order to maintain a healthy school population. This includes a student population which is drug and alcohol free. If any illness or health problem is identified through this testing, then the Board will take the necessary steps to correct any such problem. Included in these corrective measures would be counseling and other rehabilitative procedures to treat the illness caused by drug and alcohol abuse.

ADMINISTRATIVE PROCEDURES FOR POLICY 5141.3
Pursuant to Board Policies requiring a comprehensive medical examination, of each pupil, the procedural guidelines are as follows:

SECTION 1. NOTICE
A. In or about the month of September preceding every school year, the Board of Education shall conduct comprehensive medical examinations, in accordance with state law, of all those pupils to be enrolled in the district that school year. The examinations are of all pupils, to be conducted on school premises, or at some other place as directed by the school physician and as may be approved by the Board of Education, and by the physician and his or her appointees.
The comprehensive medical examinations shall be conducted over a period of approximately 4-6 weeks, commencing in or about the first week of September. The student population will be divided into approximately four to six groups and the parents or legal guardians of each pupil shall be notified, in writing, at least ten (10) days prior to the scheduled date for examination. The notice shall include the time and place when the pupil is to report for the examination and any information the pupil is to bring to the examination. The notice shall advise the parent or legal guardian of his or her right to be present at *65 the examination. If the parent or legal guardian cannot be present, then the examination will be conducted in the presence of a nurse or teacher of the same gender as the pupil.

SECTION 2. CONDUCT OF EXAMINATION
A. The examination shall be conducted in a medically acceptable manner and environment. Each child shall be examined in a manner so as to facilitate inspection in accordance with this policy and of the state rules and regulations concerning such examinations.
B. In addition to the scope of the comprehensive medical examination as outlined in Schedule A and as required by law and state regulation, the medical personnel, under the supervision of the medical examiner, shall take a blood sample by the finger stick method. This sample shall be taken for the purpose of discerning the existence of infections, blood disorders and anemia.
C. In the same manner and environment as above indicated, the medical examiner shall ask each pupil for a urine sample, to be obtained in a medically appropriate method. The sample shall be obtained for the purpose of discerning the level of protein, sugar, specific gravity, blood and the existence or non-existence of controlled dangerous substances, non-authorized prescription drugs as defined in the introductory statement, and alcohol.

SECTION 3. PRIVATE COMPREHENSIVE MEDICAL EXAMINATION
A. A parent or legal guardian may undertake to have the pupil examined by a private physician of his or her own choosing in lieu of the comprehensive medical examination by the school physician. In such a case, the parent or legal guardian must notify the school nurse, in writing, of his or her election within five (5) days prior to the scheduled examination. The appropriate comprehensive medical examination form must be completed in its entirety by the private physician within fifteen (15) days after the scheduled examination. No student shall be *66 permitted to participate in any school sponsored activity until the school nurse receives this completed comprehensive medical examination report from the pupil's private physician.
B. If a private physician examines a pupil, it is the responsibility of the parent or legal guardian to instruct the private physician as to the scope of the examination. The entire cost of the private examination shall be borne by the parent or legal guardians.

SECTION 4. REFUSAL TO COMPLY WITH ANY ASPECT OF THE COMPREHENSIVE MEDICAL EXAMINATION
A. Should any pupil not complete the comprehensive medical examination, the parent or legal guardian shall be immediately notified by the Superintendent. This notice shall advise the parent or legal guardian, or the pupil, should he or she have attained the age of 18 years of age at the time of the examination, that the comprehensive medical examination is part of the regularly scheduled school physical, and that the failure to complete any portion of this comprehensive medical examination form shall render this physical incomplete. The notice shall advise the parent, legal guardian or, if appropriate, the pupil, that an incomplete physical will prevent the school physican from certifying as to the pupil's health in accordance with state rules, which will result in the pupil's exclusion from classroom study pursuant to state health rules. This provision concerning exclusion shall in no way be deemed an expulsion or suspension of the pupil. Finally, without indicating whether or not the specific refusal may warrant it, the parent or legal guardian shall be advised of the penalty which may be imposed pursuant to N.J.S.A. 18A:40-9 when such parent or legal guardian shall fail, within a reasonable time, to remedy the cause for the exclusion.

SECTION 5. COMPREHENSIVE MEDICAL EXAMINATION TESTS
A. If the comprehensive medical examination test results disclose the existence of disease, disorder, defect or any adverse *67 or potentially adverse condition in the pupil's health as it effects the general school population, the school physician shall follow the rules and procedures as promulgated by the state and this Board concerning same.
B. Where a urine sample has disclosed the presence of alcohol, narcotic or non-narcotic controlled dangerous substance; or unauthorized prescription drug, the school physician will immediately notify the parent, legal guardian or student, if over age 18, of this fact, and, the Superintendent. The school physician will then determine if, in his opinion, the pupil is able to continue classroom study. Except as hereinafter provided, the decision of the school physician shall be final.
C. In addition to these requirements set forth by the school physician, the following procedures shall also be implemented:
1. The school physician shall maintain a separate confidential medical file of test results in accordance with the law. The Superintendent shall notify the parents or legal guardians, in writing, of any abnormality that is discovered during the comprehensive medical examination within two (2) school days of receipt of the test results. This includes a positive result revealed from the drug/alcohol screening test.
2. If there is a positive result, the Superintendent, school physician, parent or legal guardian and pupil shall meet to discuss the results of the test, the nature of the problem and the course of action to be taken.
3. The meeting set forth in the above paragraph shall be held for the purpose of further identifying whether a serious medical problem exists; specifically, drug and/or alcohol use; clarifying the nature and extent of such medical problem, and advising the pupil and parent or legal guardian of the procedures to be followed. This paragraph shall apply regardless of whether the physician has refused to certify as to the pupil's health and has excluded the pupil from classroom study.
4. Based upon the information obtained from the above-mentioned meeting, and upon the advice of the school physician, *68 the Superintendent shall make any recommendations necessary to facilitate the effective rehabilitation of the pupil. These recommendations shall be dependent upon, in all instances, the nature of the medical problem or potential drug and/or alcohol problem, and the cooperation received from the parent or legal guardian and pupil. Such recommendations may include, but are not limited to:
a. Periodic Parental Conferences  The Board recognizes that many cases of potential medical, drug, and/or alcohol problems may be dealt with by educating the parents or legal guardian. Although the Board does not intend to immediately classify the specific student as having a drug and/or alcohol problem, or addiction, the Board recognizes the importance of addressing these questions early so as to prevent the development of any future substance abuse. In many cases, the Board agrees that advising a parent of a child's drug/alcohol use is the first essential step toward addressing the problem, and frequently such step will be a final one. However, the Board is of the opinion that some teens with a drug/alcohol problem require more guidance than others and, depending upon the degree of anticipated parental cooperation, and at all times with the school physician's advice, the Superintendent may make further recommendations as contained herein.
b. Referral to the district's internal alcohol or drug supervision program.
c. Referral of the case to the Bergen County District Office of the Division of Youth and Family Services. This recommendation shall be made only in the case where the school physician and Superintendent are of the opinion that a specific drug/alcohol problem exists, or that a pupil's health is in danger, or that the pupil's home environment is such that the opinion and intentions contained in Section 1 of this paragraph are not likely to be accomplished.
d. Immediately after the initial meeting between the Superintendent, school physician, parent or legal guardian and pupil *69 as above set forth, and depending upon the recommendation of the Superintendent, the school physician may amend, modify or reverse his or her previous decision to exclude the pupil from classroom study. Even with the existence of a drug or alcohol problem, the physician may certify to the pupil's health or condition, so long as the aforementioned Superintendent's recommendations are complied with. Such condition may include any other limitation or requirement allowed by law, including the scheduling of subsequent periodic medical testing.
e. At all times, and unless the specific information must, by law, be included in the pupil's general medical file, all data concerning any action undertaken pursuant to this policy section shall be kept confidential and will be available to only those with the authority as prescribed by law.

SECTION 6. SEVERABILITY
Should any sentence, clause, provision or paragraph of this entire policy be deemed unlawful or unconstitutional, it is intended that, insofar as may be practicable, the remaining portions of this policy shall remain in full force and effect.