219 N.J. Super. 352 (1986)
530 A.2d 371
HANNAH ALLEN AND FELIPE CLEMENTE, PLAINTIFFS,
v.
COUNTY OF PASSAIC AND EDWIN ENGLEHARDT, SHERIFF OF PASSAIC COUNTY, DEFENDANTS.
JOHN TURI AND JESS MONZO, PLAINTIFFS,
v.
COUNTY OF PASSAIC; PASSAIC COUNTY BOARD OF CHOSEN FREEHOLDERS; EDWIN ENGLEHARDT, SHERIFF OF PASSAIC COUNTY; BERNARD KERIK, DEPUTY WARDEN OF THE PASSAIC COUNTY JAIL, SHERIFF'S DEPARTMENT; JOSEPH A. FALCONE, PROSECUTOR OF PASSAIC COUNTY, DEFENDANTS.
Superior Court of New Jersey, Law Division (Civil), Passaic County.
Decided June 23, 1986.
*354 Johnson, Johnson & Murphy, attorneys for plaintiffs Allen and Clemente (Jeffrey M. Kassover, on the brief.)
Kalman Harris Geist, attorney for plaintiffs Turi and Monzo (Linda B. Sinofsky, on the brief).
Raymond P. Vivino, Passaic Cty. Counsel, attorney for defendant Passaic Cty. (Michael H. Glovin, Assistant County Counsel, on the brief).
Joseph A. Falcone, Passaic Cty. Pros., (Dante P. Mongiardo, on the brief).
Diamond, Afflitto & Raimondi, attorneys for defendant Englehardt (Joseph T. Afflitto, on the brief).
MANDAK, A.J.S.C.
On January 6, 1986 Edwin Englehardt, the Sheriff of Passaic County, issued a directive (Appendix A) requiring all personnel employed in the Sheriff's Department to undergo mandatory urinalysis for the purpose of testing for the use of controlled dangerous substances. Prior to the institution of the present action, most of the employees in the Sheriff's Department had already submitted to urinalysis pursuant to the directive.
The procedural history of the instant matters has been relatively uncomplicated but still deserves mention. Both matters were initiated by the filing of a verified complaint and the entry of an Order to Show Cause providing for interim restraints temporarily enjoining the Sheriff from implementing or enforcing the directive. On the return date of each Order to Show Cause the court heard further argument and continued the *355 restraints pending final determination of whether the restraints should be made permanent.
The four plaintiffs in the two actions now consolidated are all officers employed in the Sheriff's Department and all are assigned to duty at the Passaic County Jail. The pleadings describe the job title for plaintiffs Turi and Monzo to be correction officers. No specific job title is provided for plaintiffs Allen and Clemente, nor is the court made aware of their assigned duties. Unfortunately, no party offered to present any testimony or produce any evidence at the hearing other than the certifications of parties and therefore the facts are not well developed.
All plaintiffs fall under the umbrella of the directive and consequently are required to submit to the urinalysis or, as the directive provides, be subject to "disciplinary action and/or dismissal." If the tests are taken and a positive result is obtained, the officers are provided with three options, namely: (1) resign; (2) agree to participate in a program that would correct any drug abuse problem; or (3) failing the acceptance of options (1) or (2) the information from the drug test would be turned over to the Passaic County Prosecutor. These options are not part of the directive, nor are they incorporated in any official document presented to the court or promulgated to the employees. Rather the options originate from a certification of Sheriff Englehardt wherein he recites how he handled those situations where urinalysis proved positive.[1]
A brief recount of predirective background information will be of benefit. In the past there have been instances where drugs and other contraband were found in the possession of inmates at the Passaic County Jail. Although security measures were apparently put in place to minimize, if not eliminate, the delivery of drugs to inmates, it was determined in the spring of 1985 that the problem still persisted. The problem *356 appeared twofold. Information was received from various sources indicating that correction officers were involved in providing drugs to inmates and that a "small" number of correction officers were drug users. An undercover investigator was thereafter assigned to the jail and with the assistance of agents from the Federal Drug Enforcement Agency one correction officer was arrested and charged with distribution and use of cocaine, to which he eventually pleaded guilty.
The investigation continued by local staff personnel and led to the detection of other correction officers involved in the possession and use of controlled dangerous substances, among them the plaintiffs Monzo and Turi. As many as ten officers are named in the statements of witnesses provided to the court as being so involved. Possessed with this information the Passaic County Sheriff issued the directive in question to insure that correction officers were not using controlled dangerous substances.
The plaintiffs challenge the directive on a number of grounds contending that the implementation and enforcement of the directive would violate the search and seizure provisions of Article I, par. 7 of the New Jersey Constitution and the Fourth Amendment of the United States Constitution. More pointedly, the plaintiffs argue that the compelled submission of a urine sample to determine the existence or non-existence of controlled dangerous substances constitutes an impermissible search and seizure and is intrusive of the right to privacy and violative of the safeguards provided to citizens under the United States and New Jersey Constitutions. Moreover, it is urged that the New Jersey Constitution has been interpreted by the New Jersey Supreme Court to provide even greater protection for individual rights than provided by the Federal Constitution. Plaintiffs contend further that the blanket nature of the search is per se unreasonable, and that equally unreasonable is the failure of the directive to provide standards for its implementation such as the type of tests to be used, the control and disposition of the *357 test results and the effect of the test results on employment status.
The Fourth Amendment to the United States Constitution reads as follows:
Search and seizures
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Article I, par. 7 of the New Jersey Constitution is almost identical, the difference being the use in two instances of alternative words that are not relevant to the issues before this Court.[2] The consistently recognized purpose of these constitutional search and seizure provisions is to insure and safeguard the privacy and security of individuals against arbitrary invasion of governmental officials. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).
The threshold issue of whether urine testing is a search and seizure within the perimeters of these constitutional provisions is not in dispute. The defendants acknowledge that drug testing by means of urinalysis is considered a "search" under the aforesaid constitutional provisions and that compelled submission of a urine sample to determine the presence of a controlled dangerous substance constitutes a search and seizure. Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908, 918 (1966); Allen v. City of Marietta, 601 F. Supp. 482, 488-489 (N.D.Ga. 1985); Storms v. Coughlin, 600 F. Supp. 1214, 1217-1218 (S.D.N.Y. 1984); Division 241 Amalgamated Transit Union (AFL-CIO) v. Suscy, 538 F.2d *358 1264 (7th Cir.1976), cert. den. 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); Ewing v. State, 160 Ind. App. 138, 148, 310 N.E.2d 571, 577-578 (Ind. App. 1978).
Nor is there any dispute that the Fourth Amendment's prohibition against unreasonable search and seizures applies to searches conducted by public officials. New Jersey v. T.L.O., 469 U.S. 325, 333, 105 S.Ct. 733, 739-740, 83 L.Ed.2d 720, 729 (1985). It is well established that searches by such public or governmental officials, including inspections for administrative purposes, must satisfy constitutional reasonable standards. Camara v. Municipal Court. See also, Dome Realty v. City of Paterson, 83 N.J. 212, 239-241 (1980).
The U.S. Constitution and the New Jersey Constitution provide that all persons shall be free from unreasonable searches and seizures. [Emphasis supplied.] U.S. Const., Amend. IV, N.J. Const. (1947), Art. I, par. 7. It arguably follows that if the search and seizure is not unreasonable, then these constitutional provisions do not apply and the constitutional protections afforded by them are not available. Thus if the actions by the Sheriff under the facts and circumstances of this case are found to be reasonable, the mandated security of privacy made available by constitutional provisions and the necessity for probable cause and issuance of a warrant are no longer present. Carroll v. United States, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543, 549 (1925); State v. Slockbower, 79 N.J. 1, 22-23 (1979).
This rationale directed to the question of reasonableness draws opposition from those who espouse a correlation between "reasonableness" and the procurement of a warrant based on probable cause. The emphasis in the latter situation is placed on the absolute need for a warrant based on probable cause, with the result necessitating a conclusion that warrantless searches are per se unreasonable. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 *359 L.Ed.2d 732, 742-743 (1984); Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298 (1978); Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). The distinction, however, is quite simple. Under the "reasonableness" theory, the court must first react to the issue of reasonableness to determine the need for probable cause and concomitantly the warrant. Under the "probable cause" theory the issue of reasonableness is never independently determined but rather based solely on the existence or nonexistence of a warrant, the underlying principle requiring the existence of both probable cause and a warrant to establish reasonableness, or as earlier conversely stated "warrantless searches are per se unreasonable."
In weighing these legal theories, consideration must first be given to the context in which the terms reasonable and unreasonable are to be defined and applied. The issue then to be decided is the interpretation and application of the word "unreasonable" in its constitutional context to the facts and circumstances surrounding the issuance and enforcement of the Sheriff's directive. The plaintiffs urge that the polestar of this question is found in State v. Novembrino, 200 N.J. Super. 229 (App.Div. 1985), wherein the Appellate Division held that "a nonconsensual search for evidence of a crime which is conducted without probable cause is unreasonable." Id. at 238. The argument is that all searches not based on probable cause are unreasonable no matter what the supportive circumstances might be. Under this analysis the condition precedent of probable cause is a primary determinative factor as to reasonableness, and a lack of probable cause alone justifies characterizing the search as unreasonable. It necessarily follows from such a theory that every search and seizure not founded on probable cause is constitutionally prohibited.
An alternate theory, and the one urged by the defendants is to examine the question of constitutional permissibility based on the application of reasonableness from the standpoint of balancing the interests of the individual against governmental *360 interests. Under this theory, the court is required to balance the need for the search, i.e., the public interest of maintaining the safety, order and security of whatever governmental responsibility is involved, against the invasion of privacy or the intrusion that the search entails. Camara v. Municipal Court. It necessarily follows from this theory that if the search is conducted without a search warrant or on the basis of some standard not reaching the level of probable cause, such conduct, in and of itself, does not render such a search unreasonable.
Giving consideration to these alternative positions, I am satisfied that the plaintiffs' reliance on State v. Novembrino, as supportive of a mandatory requirement of probable cause in all situations involving search and seizures is misplaced. In Novembrino it was suspected that the defendant was in possession of certain controlled dangerous substances with intent to distribute and the search and seizure were performed exclusively to confirm that suspicion and to obtain evidence of a crime. The search and siezure were therefore performed strictly in a criminal context. Although there is evidence in the instant case that the test results of some correction officers were turned over to the Passaic County Prosecutor, the primary purpose of the administrative directive and urinalysis was to insure that Sheriff's officers were not, from an employment performance standpoint, involved in the use or abuse of controlled dangerous substances. Although the use of the threat of informing the County Prosecutor as an enforcement tool may have some impact on the question of reasonableness, it does not rise to the level of the criminal episodes enuciated in Novembrino. The New Jersey Supreme Court in the matter of In re Martin, 90 N.J. 295 (1982), noted this distinction:
In the criminal context, a warrant may be issued only on a probable cause showing that would lead a reasonable person to believe that a crime has been committed and that evidence of that crime will be found in a particular place. Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134, 138 (1959). However, the probable cause showing necessary to obtain an administrative warrant is less stringent. Searches pursuant to administrative warrants are conducted to enforce regulatory statutes, rather than to investigate criminal *361 activity. Experience has demonstrated the utility of periodic inspections in promoting compliance with regulatory statutes. See, e.g., Camara v. Municipal Court, 387 U.S. at 538, 87 S.Ct. at 1735, 18 L.Ed.2d at 940. In such cases, probable cause in the criminal sense is not constitutionally required. [90 N.J. at 315].
See also, State v. Young, 87 N.J. 132, 142, n. 4 (1981). Consequently, in certain instances when the search is motivated by reasons unrelated to criminality and is conducted for reasons other than to procure evidence of a crime, the requirement of probable cause may be reduced. Such an exception to the probable cause requirement has been recognized where the search is related to highly regulated or closely supervised businesses. In re Martin. For example, warrantless searches have been judicially sustained in the absence of probable cause in cases involving the liquor industry, State v. Zurawski, 89 N.J. Super. 488 (App.Div. 1965), aff'd o.b. 47 N.J. 160 (1966), the drug and pharmaceutical industry, State v. Rednor, 203 N.J. Super. 503 (App.Div. 1985), the horse racing industry, State v. Dolce, 178 N.J. Super. 275 (App.Div. 1981) and casino gambling, In re Martin.
The New Jersey Supreme Court recently reviewed Fourth Amendment rights in a school setting, one not normally associated with or parallel to a highly regulated or closely supervised business, but one nonetheless involving a high degree of supervision and administrative control. State in re T.L.O., 94 N.J. 331 (1983).[3] In T.L.O., the New Jersey Supreme Court considered the exclusionary rule in the context of the warrantless search made of a student's purse. The Court noted the legitimate charge to school officials to maintain order, safety and discipline and weighed that charge against the competing demands of the constitutional right of privacy. Referring to *362 specific statutory authority conferred on school officials, the Court concluded:
Taken together, these statutes yield the proposition that school officials, within the school setting, have the authority to conduct reasonable searches necessary to maintain safety, order and discipline within the schools. [94 N.J. at 343].
Referring to Moore v. Student Affairs Committee of Troy State Univ., 284 F. Supp. 725 (M.D.Ala. 1968), as comporting with "prevailing decisional law" on the subject of searches in a school setting and more specifically a college dormitory search, the Supreme Court in T.L.O. observed that
The validity of the regulation authorizing search of dormitories thus does not depend on whether a student `waives' his right to Fourth Amendment protection or on whether he has `contracted' it away; rather, its validity is determined by whether the regulation is a reasonable exercise of the (school's) supervisory duty. In other words, if the regulation  or, in the absence of a regulation, the action of the (school) authorities  is necessary in aid of the basic responsibility of the institution regarding discipline and the maintenance of an `educational atmosphere,' then it will be presumed facially reasonable despite the fact that it may infringe to some extent on the outer bounds of the Fourth Amendment rights of students. [94 N.J. at 343; citation omitted.]
Even more recently Odenheim v. Carlstadt-East Rutherford Regional School District, 211 N.J. Super. 54 (ch. 1985), involving a Board of Education policy requiring urinalysis of students as part of an annual physical, the court, while finding the policy unconstitutional as violative of the students' expectation of privacy, arrived at its holding by application of the balancing test (to determine reasonableness) as established in T.L.O., 94 N.J. at 344, and as supported by the United States Supreme Court in its appellate review, T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).[4]
The vocation encompassing the supervision and rehabilitation of criminal defendants and prisoners may not fit precisely into *363 the mold of an industry "subject to persuasive or long standing governmental regulation", State v. Dolce, 178 N.J. Super. at 283, but its function is similarly affected by a substantial public interest that demands a high degree of regulation and scrutiny to insure its proper and effective fullfillment. The function here is not an example of governmental regulation, but rather one of governmental response, and as such it surely can be likened to, if not rise to, a higher level of public need and concern than the so-called regulated industries. It is not surprising then that New Jersey courts have recognized this need and while balancing such need with the diminished expectation of privacy by those who are in the "corrections" system because of the conviction of a crime or offense, have concluded once again that constitutional rights may give way when reasonableness prevails. Thus, in State v. Nunziato, 178 N.J. Super. 216 (Law Div. 1981), the court in applying a reasonableness approach concluded that a prisoner on work release has a very limited expectation of privacy while serving his sentence and a warrantless search of his garage was reasonable and not violative of the prisoner's constitutional rights. In State v. Bollinger, 169 N.J. Super. 553 (Law Div. 1979), the court was required to consider whether the fruits of a warrantless search of a probationer's person and property may be used for a new indictable offense. Relying heavily on the condition of probation providing for such searches, the court concluded that a warrantless search of probationer's home and car without probable cause was not impermissible because "(a) probationer does not enjoy the full benefit of all the rights guaranteed under the constitution." Id. at 562. The court added as a limiting factor that such searches should be conducted only by probation officers and at such times and in such manner that are reasonable.[5] Both Nunziato and Bollinger refer to Latta v. Fitzharris, *364 521 F.2d 246 (9th Cir.1975), cert. den. 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975) wherein the Court of Appeals for the 9th Circuit stated:
A California Parolee is in a different position from that of the ordinary citizen. He is still serving his sentence. He remains under ... the immediate control of his parole officer. His parole is subject to revocation for reasons that would not permit the arrest or incarceration of other persons.
....
We think that one of these restrictions, necessary to the effective operation of the parole system, is that the parolee and his home are subject to search by the parole officer when the officer reasonably believes that such search is necessary in the performance of his duties. The parole officer ought to know more about the parolee than anyone else but his family. He is therefore in a better position than anyone else to decide whether a search is necessary. His decision may be based upon specific facts, though they be less than sufficient to sustain a finding probable cause. [521 F.2d at 249-250.]
Although the permissible scope of searches of those persons involved as defendants in the criminal justice system is not altogether clear, the majority of cases in both the State and Federal courts support such searches when the circumstances surrounding the search are reasonably related to the purposes of probation or parole and the search is conducted in a reasonable manner. United States v. Consuelo-Gonzalez, 521 F.2d 259 (9th Cir.1975); People v. Mason, 5 Cal.3d 759, 97 Cal. Rptr. 636, 488 P.2d 630 (Sup.Ct. 1971), cert. den. 405 U.S. 1016, 92 S.Ct. 1289, 31 L.Ed.2d 478 (1972); People v. Fortunato, 50 A.D.2d 38, 376 N.Y.S.2d 723 (N.Y. App. Div. 1975); State v. Fisher, 32 Or. App. 465, 574 P.2d 354 (Or. Ct. App. 1978). But see, United States v. Bradley, 571 F.2d 787 (4th Cir.1978), and United States v. Workmen, 585 F.2d 1205 (4th Cir.1978), which reject the rationale of Latta v. Fitzharris.
There is a line of cases involving road blocks and vehicle check points that present yet another departure from probable cause requirements. These cases have developed from the United States Supreme Court decision in Delaware v. Prouse, *365 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), holding that random investigatory stops of motor vehicles made without probable cause or reasonable suspicion were unconstitutional because such stops were subject to "the unbridled discretion of law enforcement officials." 440 U.S. at 661, 99 S.Ct. at 1400. Concerned with the potential abuse of that discretion, Prouse requires that such regulatory inspection be in accordance with reasonably established "neutral criteria." Id. at 662, 99 S.Ct. at 1400. While noting the infirmity of "random stops" and realizing the existing broad potential to satisfy a requirement of "neutral criteria" the United States Supreme Court extended an invitation to the several states to arrange for acceptable alternative methods and procedures for road blocks or vehicle check points. The first reported case in New Jersey after Prouse is State v. Coccomo, 177 N.J. Super. 575 (Law Div. 1980), wherein the court considered a written police department policy of stopping every fifth vehicle during certain established hours. The issue presented was whether the practice was reasonable, balancing the State's interest in promoting highway safety against the motorist's interest in his or her expectation of privacy. Upon an examination of all the facts and circumstances of the policy and its implementation, the court concluded that neither the Fourth Amendment of the United States Constitution nor Article I, par. 7 of the New Jersey Constitution was offended by the procedures employed because the police were following specified defined standards, the system was completely objective, the criteria employed were neutral and more particularly, the evil of unbridled discretion prohibited by Prouse was nonexistent.
The constitutionality of road blocks more recently arose in State v. Kirk, 202 N.J. Super. 28 (App.Div. 1985). Here it was determined that the police procedures employed were not distinguishable from the random investigatory stop condemned in Prouse, the court stating that the:
temporary road block was set up by the exercise of absolute, unbridled discretion of the officers in the field. There was no command or supervisory *366 participation involved. There were no limits or directions of any kind on the "when, where and how" of this road block, and no hint as to any particular "why." There was no demonstration of need or efficacy at this particular time and place. [202 N.J. Super. at 37].
Federal courts considering Fourth Amendment requirements have also struggled to accommodate the individual interest of privacy and the sometimes competing interest of government and society and have arrived at varied results. The substantial majority however have concluded that the probable cause requirement is not inviolate and there are times and circumstances where the interest of government and society is so great, the expectation of privacy diminished, and the intrusion so minimal, that some deviation from the sanctity of probable cause is justified. Thus the majority opinion of the United States Supreme Court in New Jersey v. T.L.O., observed that:
"probable cause" is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although "both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, ... in certain limited circumstances neither is required." [469 U.S. at 340, 105 S.Ct. at 743, 83 L.Ed.2d at 734.]
Other federal decisions have recognized the legality of searches and seizures under circumstances not rising to the level of probable cause. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop and frisk searches); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1979) (stop and search procedures to prevent entry of illegal aliens); United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (inspection of businesses dealing in firearms).
The litany of these cases establishes quite convincingly that the plaintiffs' argument that all searches are unreasonable unless supported by probable cause must be rejected. So too must the plaintiffs' contention that State v. Novembrino, as supportive of a continuing trend by New Jersey courts to insist on a more demanding standard under Article I, par. 7 of the New Jersey Constitution as it pertains to search and seizures, should be applied to the circumstances involved here. The *367 court in Novembrino did indeed demand a higher standard by rejecting the good faith exception to the exclusionary rule as adopted in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Although there has developed over the past several years a tendency on the part of state courts around the country to cite state constitutions as a means of expanding the protection of individual rights, a trend labeled "judicial federalism",[6] such is not the case in the instant matter because Novembrino is simply not applicable nor controlling. Rather the Novembrino court, in a purely criminal setting, reacted to the well established principle requiring "probable cause to conduct a nonconsensual search for evidence of a crime, whether with or without a warrant." Novembrino, 200 N.J. Super. at 237, 491 A.2d 37. The court acknowledged exceptions to the indispensable requirement of probable cause but observed that under N.J. Const. (1947), Art. I, par. 7 "no exception to the requirement for probable cause before conducting a nonconsensual search for evidence of a crime ... ha[d] yet been recognized." Novembrino, 200 N.J. Super. at 238; [emphasis supplied].
However, where evidence of a crime is not the purpose of the search and when the character of the search falls within one of the limited but clearly delineated classes of cases where a substantial government need is found to exist, the intrusion of privacy is kept at a minimum, and the circumstances of the search are reasonable, New Jersey courts have not been reluctant to dispense with the probable cause requirement, albeit with caution, and pursue a course of diminished justification. When applied to the facts in the instant matter, these considerations are significant because there is no reported New Jersey case dealing with urinalysis testing of employees. Therefore an examination of the decisions of the Federal courts and the courts of other states is necessary for guidance. In doing so, *368 this court need not be constrained to adopt a higher standard than that presented in other jurisdictions nor is this court inclined to diminish the constitutional safeguards already firmly established. The task rather is to view the decisions of other jurisdictions in the light of New Jersey case law and arrive at a final determination that is found consistent with the thinking of our courts in circumstances possibly not entirely similar, but sufficiently analogous to justify comparisons.
The earlier review of the "reasonable" and "probable cause" theories of interpretation of constitutional provisions concerning search and seizure, although at first blush seemingly divergent, may not in reality be at completely opposite extremes. This is because those courts which have consistently attempted to conserve the need for probable cause have nonetheless acknowledged that there does exist a carefully defined class of cases where the need for probable cause and a warrant may be excused. As already noted, one of the classes so acknowledged as an exception to the probable cause and warrant requirement is the circumstance where legitimate government purposes are persuasive enough to create a need that outweighs an inoffensive violation of privacy.
The more persuasive case law holds that the true test must be that of reasonableness determined by balancing the intrusiveness of the search on the one hand against promoting the legitimate interests of government and society on the other. Illinois v. Lafayette, 462 U.S. 640, 644, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65, 70 (1983); United States v. Villamonte-Marquez, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667-668 (1979). In Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979), the Supreme Court provides guidelines as to the test of reasonableness:
The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular *369 intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. [Id.; citations omitted].
Applying these criteria to the facts of the instant matter, the issues that must first be addressed are whether the probable cause requirement may be relaxed because of the reasonableness standard, and if so, what safeguards shall apply to prevent unnecessary and improper invasion of privacy.
In considering these issues, it is important first to examine the purpose of the urinalysis in question. Information came to the attention of the Sheriff indicating that correction officers were involved in providing inmates with drugs.[7] Notwithstanding additional security measures, the influx of drugs to prison inmates still persisted,[8] and further information was received evidencing both use and distribution of drugs among certain correction officers.[9] In this factual framework, the Sheriff in par. 14 of his certification asserts the following:
The purpose of requiring the urine analysis by Corrections Officers and other employees of the Sheriff's Department was not and is not for the purpose of gathering evidence for prosecution. In fact, the purpose was to gain some assurance for my Department, and for the public, that members of the Sheriff's Department, and particularly Corrections Officers, were not involved in the use of controlled dangerous substances. The purpose in providing for future testing was and is to continue to assure that employees charged with the responsibility of protecting the safety and security of the inmates, each other and the public were not involved in drug use, which in addition to being illegal, might also impair their ability to discharge their duties.
Although one of the alternatives provided an employee in the Sheriff's Department after a positive test result was submission of the results to the Passaic County Prosecutor if the employee refused to resign or undergo a rehabilitation program, this court is satisfied that such an alternative was *370 neither desired nor of practical criminal consequence.[10] This alternative was rather a means of persuasion, albeit an unfair and unnecessary one, to force the employee to take one of the other two options  either resign or enter a rehabilitation program. Such a coercive tool is characterized as unnecessary since, if the directive is found to be constitutionally sound, and the employee fails to comply with any of its provisions, the penalty of "disciplinary action or dismissal" would seem equally persuasive. Notwithstanding this reference to potential criminal prosecution, the primary intention was to conduct the tests within a pure employment context, and not as part of any criminal investigation.
A similar factual situation involving employment existed in Allen v. City of Marietta, 601 F. Supp. 482 (N.D.Ga. 1985), wherein an investigation disclosed drug usage among employees of a utility company, all of whom worked on high voltage electric wires. The employees were advised that their jobs would be terminated unless they underwent urinalysis tests. After positive results, the employees were fired. The employees thereafter filed suit under 42 U.S.C.A. § 1983 for the deprivation of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution. Placing emphasis on the "purely employment" purpose of the search the court concluded that:
[T]he City has a right to make warrantless searches of its employees for the purpose of determining whether they are using or abusing drugs which would affect their ability to perform safely their work with hazardous materials. The court finds, therefore, that the urinalysis tests administered in this case were not unreasonable searches in violation of the fourth amendment. [601 F. Supp. at 491.]
*371 In a correctional institutional setting, the court, in McDonell v. Hunter, 612 F. Supp. 1122 (D.C.Iowa 1985), considered a 42 U.S.C.A. § 1983 class action challenging a department policy subjecting employees to searches including urinalysis and blood tests. Here the court did not rely on the purely employment purposes of the search but rather directed its attention to the broader issue of reasonableness giving due consideration not only to the purposes of the search but the place of employment as well. Penal institution security, therefore, was a paramount consideration. Finding that the facts supportive of the demand for urinalysis failed to rise to the level of "reasonable suspicion," the court struck down the testing as constitutionally impermissible while at the same time observing that "correctional facility security considerations reduce the scope of reasonable expectations of privacy that one normally holds and makes reasonable some intrusions that would not be reasonable outside the facility." McDonell, 612 F. Supp. at 1128. The McDonell court further observed that:
[T]here is no doubt that defendants can constitutionally conduct such `regulatory' searches of persons entering Iowa's correctional facilities, including employees, as are reasonably necessary to serve security considerations, but the searches must be guided by some appropriate standards, and must be no more intrusive than is reasonably necessary. [Id. at 1128-1129; footnote omitted.]
In Sec. & Law Enforcement Emp., Dist. C.82 v. Carey, 737 F.2d 187 (2d Cir.1984) the United States Court of Appeals, Second Circuit, considered in depth the reasonable test theory as it should be applied to correction officers. In Carey, the court had an opportunity to examine the New York State Department of Correction Services search procedures involving strip searches, visual body cavity searches and random searches in a variety of factual circumstances. Following the criteria for unreasonableness as stated in Bell v. Wolfish, the court pursued a two-prong examination, the first a consideration of "the intrusion on the individuals's fourth amendment interests requir[ing] that the intrusion be viewed in the context of the individual's legitimate expectation of privacy." 737 F.2d at 201. Reference is then made to the test for determining when an *372 expectation of privacy is legitimate, citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (1967). (Harlan, J., concurring):
There is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." [Id.]
The second prong of the reasonableness test as described in Carey requires an examination of the justification asserted for the searches in promoting legitimate government interests. 737 F.2d at 202. Recognizing that correctional facilities are unique places "fraught with serious security dangers," Bell v. Wolfish, 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481, and that it is not uncommon for inmates to obtain drugs, weapons, and other contraband, the court in Carey observes that "security problems faced by prison administrators are difficult, complex and challenging," and that there is a legitimate penological imperative "of maintaining prison security and preserving internal order and discipline." 737 F.2d at 203. Thus characterizing the reasonableness test in a correctional facility the court concludes:
After applying the reasonableness test, and thus weighing the legitimate governmental interest in maintaining correctional facility security against the invasion of privacy in light of correction officers' diminished expectations of privacy, we conclude that strip searches of correction officers, under certain circumstances, may be reasonable in the absence of warrants issued on the basis of probable cause. Our task is to determine what constitutes proper circumstances. In making this determination, the reasonableness test "requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against `an objective standard,' whether this be probable cause or a less stringent test." Prouse, 440 U.S. at 654, 99 S.Ct. at 1396 (footnotes omitted). In light of this requirement, it is our view that a reasonable suspicion standard should govern strip searches of correction officers working in correctional facilities. [Id. at 203-204].
A number of other federal and state courts have considered the constitutionality of searches in the environment of a correctional institution. In Hunter v. Auger, 672 F.2d 668 (8th Cir.1982), the Eighth Circuit struck down a policy of strip searches of prison visitors based solely on an uncorroborated anonymous tip, but established a legal standard of reasonable *373 suspicion to govern the propriety of such searches. In Armstrong v. New York State Comm'r of Correction, 545 F. Supp. 728 (N.D.N.Y. 1982), a civil rights action brought by a correction officer who had been subjected to a body cavity search at prison, the Federal District Court noted that such searches were "particularly degrading and embarrassing," Id. at 731, but nonetheless followed the balancing test suggesting that such searches could be justified "by a showing that warrantless strip searches are necessary in order to maintain institutional security," Id., or alternatively by a showing of "articulable facts as to why (the defendants) believed that the plaintiff might have had contraband concealed in his person." Id. Finally, in City of Palm Bay v. Bauman, 475 So.2d 1322 (Fla. App. 5th Dist. 1985), the court reviewed the determination of a lower court permanently enjoining the City of Palm Bay from requiring police officers and fire fighters to provide urine specimens at random and unspecified times unless probable cause existed. Following the lead of the Federal Court decision in Sec. & Law Enforcement Emp., Dist. C.82 v. Carey, and Hunter v. Auger, the Florida court embraced the "reasonable suspicion" concept describing it as "something less than probable cause, but something more than a mere suspicion." Bauman, 475 So.2d at 1326; citing State v. Hunt, 391 So.2d 760 (Fla.App. 5th Dist. 1980). See also, Adrow v. Johnson, 623 F. Supp. 1085 (D.C.Ill. 1985).
Although these cases may initially suggest the existence of a potpourri of jurisprudence, the reality is that a number of common threads are interwoven throughout producing several clear cut and firmly established principles. These may be summarized as follows:
1. Whether the urinalysis is conducted as part of a criminal investigation or for some other reason such as employment is a very significant factor of consideration.
2. In order to relax the probable cause requirement the test to be applied is whether the search is reasonable and that *374 requires a balancing of the need, supported by the promotion of a legitimate government interest, against the intrusiveness of the search relative to the individual's expectation of privacy.
3. Employees in penal and correctional institutions do not, by virtue of their employment, lose all of their Fourth Amendment rights.
4. Correctional facility security considerations reduce the scope of the reasonable expectation of privacy that one normally holds and makes reasonable some intrusions that would not be reasonable outside the facility.
The defendants support the relaxation of the probable cause standard and the application of the balancing test to determine reasonableness. They urge that a compelling need for the promotion of a legitimate government interest, namely that of the effective maintenance of penal and correctional institutions, is fundamental and of significant public concern. Correction officers and Sheriff's officers are recognized as law enforcement officers and as such may enforce the criminal law of this State, N.J.S.A. 2A:154-3. The officers' involvement in maintaining security at the county jail and at the courthouse admittedly confirms a compelling public interest. Moreover, prison officials must have some latitude in fulfilling their responsibilities  the need for flexibility is omnipresent because as the United States Supreme Court stated in Bell v. Wolfish, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 474 (1979):
[T]he problems that arise in the day-to-day operations of a corrections facility are not susceptible of easy solutions, prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.... [Id.]
Against this backdrop of need the court must balance the extent of the intrusiveness of the search. The taking of urine involves an invasion of the body constituting a search and seizure. Schmerber v. State of California. A requirement to furnish a urine sample represents an intrusion of constitutionally *375 impermissible dimensions. Yet the extent of this type of intrusion is not unduly repugnant and does not rise to the offensiveness of the strip search.[11] The taking of the urine can be made privately[12] and under conditions and circumstances that can diminish or completely avoid inconvenience and embarrassment. Nor does it per se offend the sensibilities of the average person. Examining this very question of urine testing, the court in Shoemaker v. Handel, 608 F. Supp. 1151 (D.N.J. 1985), stated that:
breathalyzer tests and urinalysis are considered less intrusive than body cavity and strip searches and those searches which have been identified as intruding upon the "integrity of the body," ... [and] [w]hile breathalyzer and urine tests require the individual involved to "give up" something, the intrusion is less than the involuntary securing of a blood sample or other searches into which an intrusion into the body is required. [Id. at 1158; citations and footnote omitted].
Considering this rather limited intrusion and weighing it against the public need associated with the supervision and operation of penal institutions, this court is satisfied that the scale tips indisputably in favor of that need. This allows for a relaxation of the probable cause requirement but still leaves open the question of what lesser standard should be applied.
Defendants contend that upon a determination allowing a relaxation of the probable cause requirement, the court must next examine the manner in which the search is conducted in order to resolve the issues of reasonableness. In this regard, the defendants apply the language of Delaware v. Prouse and suggest the final question revolves around the existence or nonexistence of an "unconstrained exercise of discretion" by individual officers. Noting that the directive in question allows *376 for no discretion on the part of individual officers to order urine testing, but rather provides for implementation only by the Sheriff, and only as to all employees, the defendants argue that both these policies and the search are therefore reasonable. The motive for this position becomes clearer when one considers that it represents support for random searches, and the directive in issue by its broad language provides for random searches. Such random searches are made without probable cause, without suspicion or without any supporting information whatsoever. Nevertheless, the defendants contend that because the random search (urine testing) is ordered for all employees without the "unconstrained exercise of discretion" it passes constitutional muster.
The only reported decision cited by the defendants in support of their position on random searches is Shoemaker v. Handel, 608 F. Supp. 1151 (D.N.J. 1985), where the New Jersey Racing Commission, by regulation, authorized urinalysis to determine drug use by horse racing jockeys. The court used the balancing test in considering the public interest created by the long standing regulation of the horse racing industry in New Jersey as against the interest of the individual's expectation of privacy, and concluded that the Racing Commissions's urinalysis program is tailored to further the State's legitimate interest in reduced drug use and thereby promoted the safety and integrity of the horse racing industry. In reaching its conclusion the Court made the following findings: (1) the State had promulgated regulations for the specific purpose of combating the use of drugs, which "plagues th[e] sport, as well as so many others." Id. at 1157; (2) urinalysis testing as applied to jockeys is not unique since boxers must undergo complete physical examinations including prefight and postfight urinalysis; (3) urinalysis tests are less intrusive and not synonymous with those that intrude upon the integrity of the body; and (4) jockeys have a diminished expectation of privacy because of the pervasive historical regulation of their industry and because:

*377 jockeys are licensed by the State to race in New Jersey, subject to the extensive and detailed conditions and regulations in effect. By securing their licensure, jockeys accept the unique benefits as well as the burdens of their trade. They have notice that the state has regulations which concern aspects of their physical and mental fitness to ride. This includes alcohol and drug use which impedes their riding performance. [Id. at 1158.]
Although some analogies can be drawn between the public interest in a highly regulated industry such as horse racing and the supervision and operation of penal institutions and courts, there are a number of factors that distinguish Shoemaker from the instant matter. The horse racing industry has historically been the subject of unbridled regulation. The New Jersey State Legislature has established a New Jersey Racing Commission, vested with broad powers over all persons involved in the industry. A number of administrative code regulations have been promulgated by the Racing Commission including authorization for breathalyzer and urine tests on jockeys who are licensed by the Racing Commission.[13] Within certain limitations, wagering is permitted and sizeable amounts of money change hands. The criminal influence is omnipresent and the sport, as are so many other professional sports, is plagued by the use of alcohol and drugs. Additionally, these regulations apply to all licensed jockeys who wish to ride in thoroughbred horse races throughout the State. Thus all jockeys licensed by the State can be subjected to the testing in the manner prescribed by the Racing Commission. There is a uniformity of application and procedure, which applies to all jockeys at all racetracks statewide. Local option is not available. Finally, in the case of jockeys, the expectation of privacy is diminished not only by the character of the vocation, but even more so by the preexistence of the regulations. Jockeys have notice up front of the regulations, their purposes, and the effect they may have on one's privacy.
*378 Jockeys therefore initially have the choice of applying for a license in New Jersey or applying elsewhere. Once the jockey voluntarily submits his application for licensing and pursues his trade in New Jersey, the argument is made that he should not later be heard to complain about its burden. Similarly, where a correction officer was subjected to body cavity search, in Armstrong v. New York State Comm'r of Corrections, 545 F. Supp. 728, 731 (N.D.N.Y. 1982), the court remarked that the correction officer's, "advance notice that he might be subject to such a search may nevertheless be considered in determining its reasonableness, since an employee who is offended will have the opportunity to seek alternative employment." Id.
Those factors supportive of the decision in the Shoemaker case are not found in the circumstances in the instant matter.[14] There has been no historical state regulation of Sheriff's officers or correction officers and each county under the direction of the County Sheriff has been left to its own resources and devices to insure the efficient and proper supervision of correctional, penal, and court facilities. Nor has there been any notice or warning upon employment that urine testing would be required. No choice was afforded to accept or decline employment based on a knowing requirement of submission to random urine testing. Moreover, the atmosphere of criminal contact in penal institutions or in a courtroom setting is substantially different from that of the criminal influence in the gambling and horseracing industry; and although during recent months professional sports have acknowledged serious concern over alcohol and drug abuse by many professional athletes, no such epidemic of drug abuse is suggested of Sheriff's officers in Passaic County.
*379 Another consideration deserving mention is that of standards. In McDonell v. Hunter, 612 F. Supp. 1122 (D.C.Iowa 1985), in referring to searches of persons entering correctional facilities, the court noted that such "searches must be guided by some appropriate standards," Id. at 1128, pointing out that the policy under consideration lacked "any standards whatsoever for its implementation," Id. n. 4. So too, the plaintiffs here complain that the directive set forth in Appendix A consisting of six lines constitutes a policy determination of significant constitutional impact, yet fails for example to advise: (1) who has the authority to authorize urine testing; (2) what personnel will be subjected to the test; (3) who will perform the test; (4) what type of test will be made; (5) how the results will be used; (6) whether the test will be confidential; (7) what rights, if any, are afforded to the employee to question the test results; (8) whether supplemental testing will be available; and (9) what provision, if any, is made for a hearing in which the employee can challenge the results of the urine test. These questions, which seem to address basic and fundamental principles of fairness and due process, remain unanswered, a situation particularly unacceptable within the structure for random searches. The rules should not be made up along the way, they should be established, complete and in place from the inception. Moreover, the tests themselves must be sufficiently reliable to establish credibility with both correction officials and the department's officers and employees. Certainly the regulations in Shoemaker can be characterized as providing a comprehensive set of standards. Such standards serve the dual purpose of setting forth the parameters of authority to those who exercise it and establish a knowledgeable understanding to those who are subjected to it. None of these purposes are either addressed or satisfied by the directive in question, and such omission is further evidence of its deficiency.
The effort by defendants to assert the balancing test and the lack of an "unconstrained exercise of discretion" as a means of supporting random searches must, under the present *380 facts, be rejected. Also rejected is the contention that the testing of all employees somehow provides an elixir which cures the diminution of constitutional safeguards. Rather, this court finds that the appropriate standard to be applied in situtations involving urinalysis of Sheriff's officers and correction officers is that of reasonable suspicion. Although the reasonable suspicion standard will develop on a case by case basis, some minimal guidelines can be provided. First, in order to satisfy the reasonable suspicion standard the correction officials must be able to point to specific objective facts supportive of the testing and any rational inferences drawn therefrom in light of their experience. Hunter, 672 F.2d at 674; McDonell, 612 F. Supp. at 1130. Stated yet another way, reasonable suspicion is not an "inchoate and unparticularized suspicion or `hunch'," Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909; "rather it is the sort of `common sense conclusio[n] about human behavior' upon which `practical people'  including government officicals  are entitled to rely." New Jersey v. T.L.O., 469 U.S. at 346, 105 S.Ct. at 746, 83 L.Ed.2d at 737. Second, and equally important, is the requirement that the suspicion be directed to a specified person. Hunter, 672 F.2d at 675. Additional factors that may be considered in determining reasonable suspicion are: "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." Carey, 737 F.2d at 205; citing United States v. Afanador, 567 F.2d 1325, 1329 n. 4 (5th Cir.1978). Once these burdens have been met, the urinalysis testing of those officers to which the reasonable suspicion is directed becomes constitutionally permissible. This approach represents the fairest way to vindicate the reduced right of privacy possessed by the officers and at the same time satisfy the interests of government by providing a procedure for administering urine tests without the necessity of establishing probable cause or procuring a warrant.
*381 To be sure, random testing has certain advantages. It is a strategy that provides an excellent investigative technique. Unannounced random testing requirements may arguably be an uncomplicated method of insuring 100 percent drug abstinence on the part of Sheriff's Department employees. But there is a substantial cost  the heavy-handed erosion of fundamental constitutional rights.
Although the "reasonable suspicion" standard may require greater effort to support than random searches, the Sheriff is not left without basic and established investigatory procedures. Observation of job performance now becomes more critical. The employment of undercover agents proved immensely successful and its continued availability provides a significant deterrent to further drug abuse. Informers have historically been a prime source of information and no doubt will continue to be so no matter what constitutional standard is applied. The requirement of physicals at the commencement of employment or regular annual physical checkups are common and normal employment practices and should not be deemed as rendered impermissible by this decision.[15] These procedures provide an arsenal of weapons that may be used by the Sheriff to insure that his officers are neither involved in the use of controlled dangerous substances or involved in their distribution to inmates or others.

AS TO PLAINTIFFS ALLEN AND CLEMENTE
Applying the aforesaid principles to the plaintiffs Allen and Clemente it is clear and undisputed that the Sheriff was not aware of any articulated facts supportive of their use or abuse of controlled dangerous substances, nor have any such facts been offered. Reasonable suspicion was neither offered nor demonstrated since the testing of these officers was supported *382 exclusively by a procedure involving random searches. The preliminary restraining order in each of their cases is continued but modified to the extent that the Sheriff shall be restrained from directing urinalysis testing of these plaintiffs unless he can satisfy the reasonable suspicion standard.

AS TO PLAINTIFFS TURI AND MONZO
With respect to the plaintiffs Turi and Monzo there is before the court the typewritten statement of Officer Lawrence Gibson and Officer Fred De Nude. These statements articulate sufficient objective facts directed to the use of controlled dangerous substances by Turi and Monzo to support a reasonable suspicion. The information set forth in these statements completely justifies if not mandates the need for urinalysis testing of these two officers. Argument might be made that the information contained in the statements is now stale. This argument is without merit. If the information has become stale, it has become so because of this litigation and not by any actions of the defendants. See State v. Blaurock, 143 N.J. Super. 476, 479-480 (App.Div. 1976). Moreover, the Sheriff has a continuing accountability to insure that employees charged with the responsibility of protecting the safety and security of the inmates, each other, and the public, are not impaired in their ability to fulfill that responsibility because of involvement with use of drugs. The information contained in the aforesaid statements is incriminating and raises serious question about the ability of these plaintiffs to properly perform their duties. Having once satisfied the reasonable suspicion standard, urinalysis testing should be permitted to continue until such time as the basis for the reasonable suspicion no longer exists. The preliminary restraining order is hereby vacated as to plaintiffs Turi and Monzo thereby restoring to the Sheriff the authority to proceed with urinalysis testing of these plaintiffs.

*383 APPENDIX A

PASSAIC COUNTY SHERIFF'S DEPARTMENT

INTERNAL MEMORANDUM
 TO: All Sheriff's Department DATE: January 7, 1986
 Personnel
 FROM: Edwin Englehardt,
 Sheriff of Passaic County
SUBJECT: MANDATORY CDS URINE ANALYSIS (Addendum to PCJ SOP)
Effective immediately, all personnel employed by this department (sworn and civilion [sic]) will be subjected to a mandatory C.D.S. urine analysis no less than twice and no more than four times annually.
Failure to comply with this directive will result in disciplinary action and/or dismissal.
 Approved: (s) Edwin Englehardt 
 Edwin Englehardt, Sheriff
 EE/BBK/je
 cc: T.C.
 I.A.
 pg. # 1 # 8
NOTES
[1] Par. 16 of Sheriff Englehardt's certification.
[2] The Court in State v. Novembrino, 200 N.J. Super. 229, 240 (App.Div. 1985), described a structural difference between the Fourth Amendment and the N.J. Const. (1947), Art. I, par. 7 noting that while the Fourth Amendment is a part of the general grant of essential powers to the Federal Government, Article I, par. 7 of the New Jersey Constitution serves to limit sovereign power and represents an explicit affirmation of fundamental rights of privacy.
[3] Thedecision of the New Jersey Supreme Court was reversed by the United States Supreme Court in New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The focus of this reversal was not on the use of any reasonableness standard (see footnote 4, infra), but rather on its application to the facts of the case.
[4] Justice White, in delivering the majority opinion for the United States Supreme Court, observed:

that the "reasonable grounds" standard applied by the New Jersey Supreme Court in its consideration of this question is not substantially different from the standard that we have adopted today. [469 U.S. at 343, 105 S.Ct. at 745, 83 L.Ed.2d at 736].
[5] Inconsidering the propriety of the condition of probation providing for searches and seizures, the court in Bollinger cited United States v. Gordon, 540 F.2d 452 (9th Cir.1976) and United States v. Jeffers, 573 F.2d 1074 (9th Cir.1978), wherein the Federal courts held the conditions of probation relative to searches and seizures to be overbroad, but nevertheless upheld the search finding the conditions narrowly construed and properly exercised.
[6] StateCourts Surpass U.S. Bench in Cases on Rights of Individuals, N.Y. Times, May 4, 1986, at 1.
[7] Par. 6 of Sheriff Englehardt's certification.
[8] Par. 11 of Sheriff Englehardt's certification.
[9] Par. 12 of Sheriff Englehardt's certification.
[10] If the results of the testing were in fact used for criminal prosecution, then the State may well be subjected to the requirement to establish probable cause and be burdened with the need to overcome the ramifications of a warrantless search. Moreover, it is arguable that the State would not pursue such criminal prosecution since the evidence would be meager and the Prosecutor is cloaked with discretion in the enforcement of criminal laws. See State v. Winne, 12 N.J. 152 (1953).
[11] In M.M. v. Anker, 607 F.2d 588, 589 (2d Cir.1979), the court observed that "as the intrusiveness of the search intensifies, the standard of Fourth Amendment `reasonableness' approaches probable cause." [Id.]. See also, State in Interest of T.L.O., 94 N.J. at 346.
[12] The furnishing of urine samples has, in certain situations, been required to be made in the presence of a witness. No such requirement was presented as part of the facts in the instant matter.
[13] Regulations have been in effect for the breathalyzer testing of harness drivers in New Jersey for many years and random urine testing has been in effect since January 1985. See Shoemaker, 608 F. Supp. at 1157.
[14] In Shoemaker the Court refers to Sec. & Law Enforcement Emp., Dist. C.82 v. Carey, as evidence of the unique intrusive nature of a strip search and visual body cavity search in applying the "reasonable suspicion" theory. Shoemaker fails to point out, however, that the court in Carey held random searches without reasonable suspicion unconstitutional.
[15] Specific reference to and approval of pre-employment physical examinations is made in McDonell v. Hunter, 612 F. Supp. at 1132 and Shoemaker, 608 F. Supp. at 1160.