**Robert MILLER, Appellant–Plaintiff,**

**v.**

**VANDERBURGH COUNTY,**
**Appellee–Defendant.**

**No. 82A01–9210–CV–353.**

Court of Appeals of Indiana,
First District.

March 16, 1993.

Transfer Denied May 21, 1993.

Michael C. Keating, Keating & Bumb, Evansville, for appellant-plaintiff.

Jeffrey A. Wilhite, Mary Lee Franke, Kahn, Dees, Donovan & Kahn, Evansville, for appellee-defendant.

BAKER, Judge.

Defendant-appellee Vanderburgh County's Sheriff's Merit Board terminated plaintiff-appellant Robert Miller's employment after Miller, a court security deputy, refused to be tested for illegal drug use. The trial court upheld the termination. Miller's appeal requires us to consider the general issue of under what circumstances a Sheriff may require a courthouse security deputy to undergo urinalysis. More precisely, we must address the following questions:

I. Must the Sheriff have a reasonable suspicion of illegal drug use before he may compel a courthouse security deputy to undergo urinalysis?

II. May the Sheriff compel a suspicionless drug test in the absence of a reasonable drug testing procedure?

We hold a courthouse security deputy may be required to submit to a suspicionless urinalysis so long as the drug testing procedure is reasonably related to the goal of determining illegal drug use. We also hold that in the absence of reasonable drug testing procedure, a courthouse security deputy may not be compelled to undergo a urinalysis without a reasonable suspicion of illegal drug use. The Vanderburgh County Sheriff's Department had no operative drug testing program. Therefore, we must also address a third question:

III. Did the Sheriff have a reasonable suspicion Miller was using illegal drugs?

## FACTS

The evidence presented to the Merit Board reveals that as of July 9, 1991, the date of the Merit Board hearing, Miller was a seventeen-year veteran of the Vanderburgh County Sheriff's Department. Immediately prior to his termination, Miller served as a court security deputy in the Vanderburgh County Court building. His duty there "basically ... [wa]s to rid the environment of the Vanderburgh County Court building of such things as weapons, knives, guns, unsavory characters hanging in the court building and to provide security for the judges of those courts." *Record* at 106. Miller was required to carry a nine millimeter handgun while on duty.

In mid-April of 1991, Miller's supervisor, Sergeant Griggs, reported to his supervisor, Chief Tucker, that Miller had missed several days of work and had been tardy on several other occasions. Chief Tucker expressed his concern to Vanderburgh County Sheriff Ray Hamner, who reviewed Miller's personnel file. Sheriff Hamner discovered Miller had a lengthy history of tardiness and sick days. Between mid–1989 and early 1990, Miller received a verbal warning for failing to be home after reporting absent due to illness, a letter of reprimand for excessive tardiness, had been suspended without pay for five days for being absent from his duty station

without leave, had received a fifteen-day suspension for failing to obtain authorization for a compensatory day off, and had received a three-day suspension for unauthorized absence. Miller missed 108 hours of work in 1990.

Miller's personnel file also showed that in the spring of 1990 Miller had undergone drug and alcohol abuse treatment at a local clinic. According to the clinic's report, Miller had told his therapist that since mid-1989 he had been drinking a pint of whiskey daily, had snorted and smoked three grams of cocaine per week, occasionally suffered blackouts, and was having difficulty at work due to absenteeism. The clinic's report also noted that Miller made several appointments for which he neither appeared nor called to cancel, and that his wife reported that she believed Miller was continuing the alcohol and drug abuse "on a heavy daily basis." *Record* at 184. The clinic terminated Miller's treatment "due to the client's disinterest[.]" *Record* at 184. It assigned a prognosis of "poor." *Record* at 184.

On May 8, 1991, after reviewing Miller's file and after observing Miller had already missed sixty-four hours of work due to illness in the first four months of 1991, Sheriff Hamner ordered Miller to submit to a urinalysis. Sheriff Hamner had never previously ordered anyone to take a drug test and the department had no written policy addressing the matter. Miller refused to take the test and was immediately suspended for disobeying a direct order. Thereafter, the Merit Board terminated Miller's employment.

Miller appealed his termination to the trial court, which, after issuing thorough findings of fact and conclusions of law which have greatly facilitated the review process, determined Miller's Fourth Amendment rights were not violated and concluded the Merit Board's decision was neither arbitrary, capricious, nor an abuse of its discretion. Miller again appeals.

## DISCUSSION AND DECISION

Miller argues he was wrongfully terminated because Sheriff Hamner could not legally order a drug test without a reasonable suspicion of illegal drug use, and that there was no probative evidence giving rise to a reasonable suspicion in his case. He observes the Sheriff's Department had no drug testing policy. He contends that because the information concerning his previous drug use was stale, Sheriff Hamner was prohibited from relying upon it. He seeks reinstatement.

Before we begin our substantive discussion, it is important to note what is not at issue here. Miller has not claimed the Merit Commission lacks the power to terminate employees who disobey lawful commands. As will be seen shortly, there is no real issue concerning the drug test's efficacy or the reasonableness of the procedures used in giving it. Finally, because Miller has chosen not to rely on the Indiana constitution, there is no issue regarding whether Indiana's constitution affords its citizens greater protection than does our federal constitution.

## I

### A

The Fourth Amendment of the United States Constitution guarantees citizens' right "to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" The Fourteenth Amendment's due process clause makes the duties imposed by the Fourth Amendment applicable to the States. *Wolf v. Colorado* (1949), 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782. Government employers, like the Vanderburgh County Sheriff's Department, are subject to the restraints of the Fourth Amendment. *See O'Connor v. Ortega* (1987), 480 U.S. 709, 715, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714, 721.

In 1989 the United States Supreme Court issued two important decisions concerning drug testing. In *National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685, the Court upheld the requirement that United States Customs Service agents seeking transfer or promotion to drug interdiction positions or positions requiring

the handling of firearms undergo urinalysis. In a companion case, *Skinner v. Railway Labor Executives' Association* (1989), 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, the Court approved the Federal Railroad Administration's regulations requiring mandatory blood and urine tests for train workers associated with certain railway accidents. These two decisions provide the analytical framework for resolving Miller's appeal.

As a starting point, *Skinner* held that a urinalysis, if compelled by the government, is a "search" within the purview of the Fourth Amendment. *Id.*, 489 U.S. at 616, 109 S.Ct. at 1412–13. *See also Von Raab*, 489 U.S. at 665, 109 S.Ct. at 1390; *Harmon v. Thornburgh* (D.C.Cir.1989), 878 F.2d 484, 487, *cert. denied*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949. Accordingly, it must meet the Fourth Amendment's reasonableness requirement. *Von Raab, supra*, 489 U.S. at 665, 109 S.Ct. at 1390. Although, as a general matter, a search must be supported by a warrant issued upon probable cause, it is a "longstanding principle" that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Id.* Several cases "have settled that, in certain limited circumstances, the Government's need to discover [latent or hidden illegal acts, conditions, or dangers], or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conditioning such searches without any measure of individualized suspicion." *Id.*, 489 U.S. at 668, 109 S.Ct. at 1392. Examples cited included *Camara v. Municipal Court* (1967), 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (building code inspections), *United States v. Martinez–Fuerte* (1976), 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (border checkpoints), and *United States v. Edwards* (2nd

Cir.1974), 498 F.2d 496 (commercial airplane luggage).

Noting the "veritable national crisis in law enforcement caused by smuggling of illicit drugs," *United States v. Montoya de Hernandez* (1985), 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381, 389, the *Von Raab* court easily concluded the government had "a compelling interest in ensuring the front-line interdiction personnel are physically fit, and have unimpeachable integrity and justice." *Id.*, 489 U.S. at 670, 109 S.Ct. at 1393. Similarly, "[t]he public interest likewise demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm, even if the incumbent is not engaged directly in the interdiction of drugs." *Id.*

In contrast to the compelling governmental interests, the Court opined the Customs Service agents who were directly involved with drug interdiction or who were required to carry firearms had a "diminished expectation of privacy in respect to the intrusions occasioned by a urine test." *Id.*, 489 U.S. at 672, 109 S.Ct. at 1394. "Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity. Much the same is true of employees who are required to carry firearms." *Id.* The Court, after concluding the public's interest in safety outweighed the employees' privacy expectations, held the government's testing procedures were lawful. *Id.*, 489 U.S. at 676–77, 109 S.Ct. at 1396.[1]

**B**

■ So it is here. We are convinced the government has a compelling interest in insuring that those individuals who secure Indiana's courthouses—with the use of deadly force, if necessary—be stone-cold sober. Courtroom shootings are occurring with alarming frequency nationwide.[2] The

---

1. For an example of the kind of governmental employees who may not be tested without reasonable suspicion, see *Harmon, supra* (Department of Justice attorneys prosecuting criminal cases and having access to grand jury proceedings).

2. As an article in the Washington Post aptly observed last summer, "America's courthouses, designed to be staid and somber settings for peaceful resolution of conflict, increasingly are becoming places where pent-up frustration explodes into violence, prompting renewed calls

general public rightly demands personal safety in the halls of justice, as do judges, attorneys, and litigants. When the citizenry does not get that safety, the effects are worse than just physical suffering; confidence in the system is shaken, if not lost altogether.

Neither can there be any doubt that an individual whose duty it is to secure a courthouse with his brains first and his nine millimeter handgun second should expect effective inquiry into his fitness and probity. Given the ferocity and degree of violence we have collectively experienced, it is absolutely essential that those individuals responsible for preventing courtroom violence be mentally fit. They must be on guard at all times, for there is simply no telling who might be next to resort to violence.[3] Moreover, we observe that guards in Miller's position routinely come into contact with the prisoners appearing in court.

In short, the combination of firearms, prisoners, and the increasingly likely possibility of enraged, irrational individuals bent on individual "justice" more than warrants a policy designed to lessen the occurrence

for tighter security." John Yang, *Outbursts of Courthouse Violence Prompt Calls for Tighter Security*, Washington Post, July 3, 1992, at A3. According to the article, more than *8,500* weapons were confiscated at federal courthouses nationwide during the year ending September 30, 1991. The article went on to note that in consecutive days in May, 1992, Reuben Larsons, who was accused of failing to pay child support, shot North Dakota judge Lawrence Jahnke, Kenneth Baumruk shot to death his estranged wife and wounded four other people while awaiting a divorce proceeding in a Missouri courtroom, and Carolyn Francis Logan shot and wounded her brother-in-law in an Alabama courtroom. *Id.*

These three incidents are by no means isolated. 1992 saw several other such shootings. *See, e.g.,* Phoenix Gazette, October 3, 1992, at A6 (reporting that Bobby Joe McKay, who was just sentenced to fifty years' imprisonment, was shot and killed by a rookie bailiff after McKay pulled a pistol in a Birmingham, Alabama, courtroom); St. Louis Post Dispatch, September 25, 1992, at 13A (reporting Rufus Harper killed Melvin Dale Robinson in a San Bernadino, California, courthouse); San Francisco Chronicle, August 15, 1992, Sec. C, at 9, col. 1 (reporting that attempted murder charges were filed against Paul Evan Salisbury, who allegedly shot and wounded three people in a San Jose, California, courthouse); Elizabeth Hudson and Bruce Selcraig, *Gunman Kills 2 in Texas Courthouse*, Washington Post, July 2, 1992, at A1 (reporting George Lott killed two attorneys and wounded two appellate judges in a Fort Worth, Texas, courtroom); Columbus Dispatch, April 17, 1992, at 10A (reporting the stabbing of a juvenile in the Franklin County Hall of Justice in Columbus, Ohio); Chicago Tribune, March 10, 1992, Sec. 1, at 3, col. 5 (reporting Benjamin Franklin stabbed Shirley Lowery in a Milwaukee, Wisconsin, courthouse); and Terry Holthaus and Mark Rollenhagen, *Commissioners to Study Courthouse Security Aids*, Cleveland Plain Dealer, January 9, 1992, at 3B (reporting the fatal shootings in the Cuyahoga County, Ohio, courthouse).

Neither is Indiana immune from this senseless violence. *See, e.g.,* Christine Davidson, *Five Victims Remain Stable*, Kokomo Tribune, April 15, 1987, Sec. 1, at 1, col. 1 (reporting that Robert David Gray detonated a bomb in the Howard County courthouse, killing himself and injuring five others); *McDaniel v. State* (1978), 268 Ind. 380, 375 N.E.2d 228 (affirming conviction of defendant who shot Officer Don Owens in a Monroe County courtroom).

1993 has started the same way. *See* New York Times, January 20, 1993, Sec. A, at 18, col. 1 (reporting that Van Huynh shot his estranged wife and two bystanders before committing suicide in a Dallas, Texas, courthouse); Indianapolis Star, March 13, 1993, at A16 (reporting that parole officer Max Almonor shot and killed his estranged wife in a Brooklyn, New York, courthouse). This list is but a small sampling. Courthouse violence is plainly a very serious problem.

3. Unfortunately, it has proven to be the case that even the most seemingly unlikely individuals have rampaged. *See, e.g.,* New York Times, July 21, 1992, Sec. A, at 16, col. 1 (reporting that former police officer Jeffrey Erickson slipped free from his handcuffs and killed a federal marshal and a security guard in the Dirksen Federal Building in Chicago, Illinois); Denver Post, July 19, 1990, Sec. B, at 2, col. 1 (reporting the divorce attorney gunned down in a Denver courtroom by former policeman Gerald Utesch lost her civil suit against the city); Philadelphia Inquirer, January 11, 1984, at F2 (reporting Thomas Provenzano, awaiting trial on a misdemeanor charge, hid a shotgun, a rifle, and a handgun in a knapsack, and killed a security officer and wounded two others in an Orlando, Florida, courtroom); and Mark A. Stein and Dan Morain, *Glendale Father of Slain Girl Shoots Suspect in S.F. Court*, Los Angeles Times, April 11, 1986, Sec. 1, at 3, col. 4 (reporting John Spiegelman, founder of "Justice for Homicide Victims," shot and wounded the man accused of killing his daughter in a San Francisco, California, courtroom). Clearly, courthouse security deputies must be on their toes and stay there.

of inebriated courthouse deputies. We conclude the government's interest in insuring the guardians of its courthouses are drug-free far outweighs the guardians' privacy rights. So long as the search used to insure that the security deputies are drug-free is reasonable, the security deputies may be tested for drugs without a reasonable suspicion of illegal drug use.

## II

■ Therein lies the rub. The Vanderburgh County Sheriff's Department had no formal drug testing policy in place. It had no informal policy. In fact, Miller was the first individual Hamner as Sheriff ever ordered to undergo a drug test. Miller's case, then, is very different from *Skinner* and *Von Raab,* in which extensive drug testing procedures had been implemented beforehand. *See Skinner, supra,* 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2; *Von Raab, supra,* 489 U.S. at 622 n. 6, 109 S.Ct. at 1416 n. 6. Because the Fourth Amendment requires that all governmental searches be reasonable, *Von Raab, supra,* 489 U.S. at 665, 109 S.Ct. at 1390, the difference is of great significance; the presence of a preconceived, legitimate drug screening policy minimizes the search's intrusiveness. And by limiting the " 'arbitrary and oppressive interference with privacy and personal security of individuals' that the Fourth Amendment was designed to prevent[,]" *id.* (citing *Martinez-Fuerte, supra,* at 428 U.S. at 554, 96 S.Ct. at 3081, 49 L.Ed.2d at 1126), the standardized policy does much to lessen the greatly disfavored "unbridled discretion upon the supervisor in the field." *Skinner, supra,* 489 U.S. at 622 n. 6, 109 S.Ct. at 1416 n. 6.

We conclude that without a reasonable drug testing procedure, the balance tips to the side requiring an individualized reasonable suspicion before a urinalysis may be ordered. Other courts considering the issue have agreed. *See Jackson v. Gates* (9th Cir.1992), 975 F.2d 648, 652–53; *Fraternal Order of Police, Lodge No. 5 v. Tucker* (3rd Cir.1989), 868 F.2d 74, 77; *Copeland v. Philadelphia Police Dep't* (3rd Cir.1988), 840 F.2d 1139, 1147, *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1636, 104 L.Ed.2d 153 (1989); *McDonell v. Hunter* (8th Cir.1987), 809 F.2d 1302, 1309; *Banks v. Dep't of Public Safety and Corrections* (1992), La.App., 598 So.2d 515, 518.[4] In

---

**4.** We wish it to be understood that we are not giving governmental employers free reign to compel suspicionless drug tests so long as they have some policy in place beforehand. The search must be reasonable and the need compelling. "The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails'." *New Jersey v. T.L.O.* (1985), 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720, 731 (citing *Camara, supra,* 387 U.S. at 537, 87 S.Ct. at 1735). Although "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means," *Skinner, supra,* 489 U.S. at 629 n. 9, 109 S.Ct. at 1419 n. 9, it is clear that to the extent feasible, governmental drug testing procedures should be tailored to minimize their intrusiveness and should do only that which is necessary to achieve their goal. In order to preserve "basic and fundamental principles of fairness and due process ... the [drug testing] rules should not be made up along the way[;] they should be established, complete, and in place from the inception." *Allen v. Passaic County* (1986), 219 N.J.Super. 352, 379, 530 A.2d 371, 384. While we have no occasion to address the matter in any detail, those governmental employers with a compelling need to implement a drug testing policy may do well to consider the following factors:

--who has the authority to compel testing
--the test's stated purpose
--whether the employee is given notice of the test
--who will perform the test
--the degree to which unnecessary embarrassment is avoided in giving the sample
--the degree to which employee adulteration is prevented
--the degree to which a proper chain of custody is insured
--whether the employee is tested for proscribed drug use only
--whether the test inadvertently reveals irrelevant information, like information about diabetes, pregnancy, and epilepsy, and how that information is used
--the test's scientific reliability
--who reviews the test results
--whether the results are confidential
--whether the results may be used against the employee for other purposes
--whether the employee may officially challenge the results
--whether supplemental tests are available
*See generally Von Raab, supra,* 489 U.S. at 672, n. 2, 109 S.Ct. at 1394, n. 2 (approving the Department of Health and Human Services reg-

this case, because the Vanderburgh County Sheriff's Department had no procedure, Sheriff Hamner needed a reasonable suspicion of illegal drug use before he could lawfully order Miller to submit to a drug test.

## III

Having determined that Miller could not properly have been tested in the absence of a reasonable suspicion of illegal drug use, we turn to the issue of whether the requisite reasonable suspicion existed.

"Reasonable suspicion" is a nebulous concept. In *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607, the Court considered when roving border patrols could stop cars and search for illegal aliens. The Court held the searches were proper "only if [the border patrol officers] are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." [5] In *Luster v. State* (1991), Ind.App., 578 N.E.2d 740, 743, an investigatory stop case, this court wrote that "[r]easonable suspicion entails some minimum level of objective justification for making a stop— that is, something more than an inchoate and unparticularized suspicion or 'hunch,' but considerably less than proof of wrongdoing by a preponderance of the evidence." Another court has stated the reasonable suspicion standard "is not difficult to meet, and in any event is a lesser standard than probable cause." *Ford v. Dowd* (8th Cir. 1991), 931 F.2d 1286, 1292. And in *T.L.O., supra,* 469 U.S. at 346, 105 S.Ct. at 745, the Supreme Court called it "the sort of common-sense conclusion about human behavior upon which practical people—including governmental officials—are entitled to rely."

■ In this case, Sheriff Hamner knew that between mid-1989 and early 1990, Miller had established a lengthy history of tardiness and excessive use of sick days. Miller had been verbally warned, given a written letter of reprimand, and had received three separate suspensions relating to his absences. Sheriff Hamner also knew that in the year prior to Miller's 1990 entry into the rehabilitation program, Miller had been drinking a pint of whiskey per day, had been snorting and smoking three grams of cocaine weekly, and had failed to complete the program. The clinic called his prognosis "poor." His wife reported that he continued to abuse alcohol and drugs "on a heavy daily basis."

We acknowledge that absenteeism alone may not give rise to a reasonable suspicion of illegal activity. *Wilder v. Koehler* (1990), 161 A.D.2d 331, 556 N.Y.S.2d 28. Here, however, absenteeism is not the only articulable fact suggesting illegal activity. Miller's absences from work occurred at exactly that time in his life when he was drinking a pint of whiskey daily and snorting and smoking three grams of cocaine per week. It is not unreasonable to conclude Miller's absences and his alcohol and drug abuse were intimately related. In the first four months of 1991, Miller had been absent a proportionately greater time than he was absent when he was known to be abusing drugs in the past. There was no indication Miller had kicked his habits; indeed, his wife reported in early to mid-1990 he continued to use drugs heavily. Under these facts and the logical inferences arising from them, we conclude Sheriff Hamner's suspicion that Miller was still abusing drugs was reasonable.

ulations governing drug testing of federal employees appearing at 53 Fed.Reg. 11979 (1988)); *Skinner, supra,* 489 U.S. at 622, n. 6, 109 S.Ct. at 1416, n. 6 (approving the Federal Railway Administration's regulations appearing at 49 C.F.R. § 219 *et seq.*); *Allen, supra,* 530 A.2d at 385.

**5.** For example, when determining whether a reasonable suspicion existed, the border patrol officers were permitted to consider their current proximity to the border, the usual patterns of traffic on the particular road, previous experience with alien traffic, information about recent illegal border crossings in the area, the driver's behavior, and the car's appearance, among others. The Court observed that "[i]n all situations, the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Id.,* 422 U.S. at 885, 95 S.Ct. at 2582.

Miller argues the information Sheriff Hamner relied upon was stale. Although no precise rule exists as to how much time can intervene between the obtaining of facts and the issuance of a search warrant, *Raymer v. State* (1985), Ind., 482 N.E.2d 253, 255, information that is too old cannot support a finding of probable cause. *United States v. McNeese* (7th Cir.1990), 901 F.2d 585, 597. "The general rule is that stale information cannot support a finding of probable cause. Stale information only gives rise to a mere suspicion and not a reasonable belief...." *Raymer, supra,* at 255.

We are not convinced Sheriff Hamner's information is so stale that his suspicion was rendered unreasonable. Granted, there was no direct "new" evidence of Miller's drug use after May of 1990. There was, however, evidence that Miller continued to be absent from work. He neither denied he was still using drugs nor asserted he had stopped using them. We will not require Sheriff Hamner to simply ignore the common-sense conclusion that in the past, Miller's drug use and his absences were likely directly related. Had there been no evidence that Miller continued to miss work, we may have been inclined to agree with his staleness argument. But with that evidence, we find Sheriff Hamner's suspicion was reasonable.

### *Conclusion*

Given both the government's compelling need to insure that the courthouse security deputies are drug-free and the deputies' diminished expectation of privacy, the Vanderburgh County Sheriff's Department could have required its court security deputies to submit to a reasonable drug test without any individualized reasonable suspicion of wrongdoing. Without a reasonable program, however, a court security deputy may not be compelled to submit to a urinalysis in the absence of a reasonable suspicion of illegal drug use. Because we agree with the trial court and with the Merit Board that a reasonable suspicion existed in this case, we conclude the order to submit to a urinalysis was lawful. Accordingly, the trial court's judgment upholding Miller's termination for failing to comply with a direct, lawful command is affirmed.

Affirmed.

NAJAM and HOFFMAN, JJ., concur.